## SECURITIES AND EXCHANGE COMMISSION

v.

## The ELECTRONICS WAREHOUSE, INC., et al.

### Civ. No. H–86–282(PCD).

United States District Court, D. Connecticut.

June 7, 1988.

Catherine Croisant and R. Cervera, U.S. S.E.C., John W. McCormack, Boston, Mass., for plaintiffs.

William R. Murphy, George E. O'Brien, New Haven, Conn., for Barnett Bank.

Richard Chamberlin, Ft. Lauderdale, Fla., Joseph O'Brien and Edward W. Case,

Adinolfi, O'Brien & Hayes, Hartford, Conn., for Calvo.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

The Securities and Exchange Commission ("the Commission") brought this action against ten defendants, including William A. Calvo, Jr., against whom are alleged numerous violations of the securities laws in connection with a public offering of stock of The Electronics Warehouse, Inc.

("Warehouse"). Calvo was the attorney for the underwriter of the offering, Gallagher & Co. ("Gallagher"). Edward W. Bremer was President and the founder of Warehouse and Gary C. Granai was Warehouse's attorney.[1]

The Commission alleges that Calvo violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a);[2] Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b);[3] Securities & Exchange Commission Rules 10b-5[4] and 10b-9;[5] and that he aided and abetted Gallagher in vio-

1. Originally named as defendants were Warehouse, Bremer, Granai, Gallagher, Russell K. and Laura K. Gallagher (principals of Gallagher), Calvo, Donald E. Erlich, Marvin T. Richmond, and Norman Stern. Warehouse has been placed under a temporary receiver. All defendants except Calvo have consented to injunctions against them, precluding future violations of federal securities laws.

2. Section 77q(a) provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

3. Section 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

4. Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

5. Rule 10b-9(a) provides:

(a) It shall constitute a "manipulative or deception device or contrivance", as used in section 10(b) of the Act, for any person, directly or indirectly, in connection with the offer or sale of any security, to make any representation:

(1) To the effect that the security is being offered or sold on an "all-or-none" basis, unless the security is part of an offering or distribution being made on the condition that all or a specified amount of the consideration paid for such security will be promptly refunded to the purchaser unless (i) all of the securities being offered are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date; or

(2) To the effect that the security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and

lating Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c) [6] and Securities & Exchange Commission Rule 15c2–4 [7] thereunder.

The complaint alleges that Warehouse made a "minimum-maximum" public offering of stock at $0.10/share which the Commission declared effective on November 8, 1984. According to the prospectus, during a specified period, funds from investors were to be held in escrow by the Barnett Bank of South Florida, N.A. ("Barnett Bank"). If a minimum of 12,000,000 shares was not sold and paid for during the specified period, all funds were to be returned to the investors. [8] If 12,000,000 shares were sold and paid for during the period, the offering would be consummated and Warehouse would receive at least $964,000.

The Commission alleges that Bremer, Granai, Calvo, Gallagher, and Russ Gallagher, with the aid of other defendants, fraudulently extended the offering beyond the period specified in the prospectus; and that, in order to make it appear that the sale of stock was complete as per the offering, they obtained short term loans which were deposited into the escrow account and inflated the number of shares allegedly sold. The loans were then repaid from the offering proceeds, a fact which was neither

(ii) the total amount due to the seller is received by him by a specified date.

6. Section 78o (c)(1) and (2) provides:
(c)(1) No broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange of which it is a member by means of any manipulative, deceptive, or other fraudulent device or contrivance, and no municipal securities dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this paragraph, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent.
(2) No broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange of which it is a member, in connection with which such broker or dealer engages in any fraudulent, deceptive, or manipulative act or practice, or makes any fictitious quotation, and no municipal securities dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security in connection with which such municipal securities dealer engages in any fraudulent, deceptive, or manipulative act or practice, or makes any fictitious quotation. The Commission shall, for the purposes of this

paragraph, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative and such quotations as are fictitious.

7. Rule 15c2–4 provides:
It shall constitute a "fraudulent, deceptive, or manipulative act or practice" as used in section 15(c)(2) of the Act, for any broker, dealer or municipal securities dealer participating in any distribution of securities, other than a firm-commitment underwriting, to accept any part of the sale price of any security being distributed unless:
(a) The money or other consideration received is promptly transmitted to the persons entitled thereto; or
(b) If the distribution is being made on an "all-or-none" basis, or on any other basis which contemplates that payment is not to be made to the person on whose behalf the distribution is being made until some further event or contingency occurs, (1) the money or other consideration received is promptly deposited in a separate bank account, as agent or trustee for the persons who have the beneficial interests therein, until the appropriate event or contingency has occurred and then the funds are promptly transmitted or returned to the persons entitled thereof, or (2) all such funds are promptly transmitted to a bank which has agreed in writing to hold all such funds in escrow for the persons who have the beneficial interests therein and to transmit or return such funds directly to the persons entitled thereto when the appropriate event or contingency has occurred.

8. In a "minimum or none" offering, the minimum sale/escrow mechanism protects investors by assuring that others in the market are willing to share the risk and by insuring that the completed offering will adequately capitalize the company. *See, e.g., SEC v. Blinder–Robinson,*

disclosed in, nor contemplated by, the prospectus. Finally, the Commission charges that defendants failed to disclose the material fact that, on March 8, 1985, Bremer was indicted by a federal grand jury in Maryland on seventeen counts of mail fraud arising from an unrelated scheme.[9]

The Commission moves for summary judgment on Counts I, II, III and V against Calvo and for the entry of an injunction restraining him from future violations of the securities laws.[10] Calvo contends that genuine issues of material fact exist as to the reasonableness of his conduct and the mental state with which he acted. Both parties have filed extensive submissions in support of their positions, including transcripts of testimony, affidavits and exhibits.

### Summary Judgment

Rule 56, Fed.R.Civ.P., provides for the entry of summary judgment where the court determines from the materials presented by the parties that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a plaintiff's motion for summary judgment, the pleadings, affidavits and exhibits are to be construed liberally in favor of the defendant, resolving all ambiguities and drawing all reasonable inferences against the movant. *American Int'l Group, Inc. v. London American Int'l Group*, 664 F.2d 348, 351 (2d Cir.1981). However, once the plaintiff satisfies the initial burden of producing evidence in support of each element of its claim, the defendant may not rest upon mere denials in his pleadings. A party opposing summary judgment must demonstrate specific facts showing that there is a genuine issue of material fact, together with evidence which is "significantly probative" of those facts. *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir.1980). *See also First Nat'l Bank of Arizona v.*

*Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). The opponent's version of the facts "must support a viable legal theory which would entitle [him], if accepted, to a judgment as a matter of law." *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir.1977). At the summary judgment stage, the court's function is not to weigh the evidence, but to determine whether any genuine issue for trial exists. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978).

### I. COUNTS I, II AND III

#### A. *Scienter*

Calvo does not dispute the existence of the fraudulent schemes alleged by the Commission with respect to the Warehouse offering, nor that the circumstances of the offering, recited above, violated the securities laws. His claim is that there are disputed issues of material fact as to whether he knowingly participated in the violations which occurred and whether he reasonably can claim that his behavior as attorney for the underwriter was without knowledge of the violations.

Violations of Sections 17(a)(1) and 10(b) and Rules 10b–5 and 10b–9 require a showing that defendant acted with "scienter" in employing a device, scheme or artifice to defraud. *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). A person acts with scienter when he intentionally or knowingly engages in the prohibited activities, *see id.* at 696, 100 S.Ct. 1945, 64 L.Ed.2d 611, or acts with reckless disregard for the truth or falsity of a material statement. *See SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985); *Sirota v. Solitron*, 673 F.2d 566, 575 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *Oleck v. Fischer*, 623 F.2d 791,

---

542 F.Supp. 468, 476 (D.Colo.1982) (discussing "all or none" offerings).

**9.** Bremer pleaded guilty to one count of mail fraud on July 24, 1985, three months after the Warehouse closing.

**10.** Counts I and V allege violations of Section 17(a), Section 10(b) and Rule 10b–5. Count II alleges violations of Section 10(b) and Rule 10b–9. Count III alleges violations of Section 15(c) and Rule 15c2–4 and names Calvo as an aider and abettor.

794–95 (2d Cir.1980) (reckless conduct generally satisfies scienter); *SEC v. Coven,* 581 F.2d 1020, 1025 (2d Cir.1978), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed. 2d 640 (1979). Recklessness has been defined as " 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.' " *Blavin,* 760 F.2d at 711, quoting *Ohio Drill & Tool Co. v. Johnson,* 625 F.2d 738, 741 (6th Cir. 1980).

■ An aider and abettor in violations of Section 15(c) of the Exchange Act and Rule 15c2–4 also must have acted with scienter. Aider and abettor liability for Gallagher's alleged violation of Section 15(c) and Rule 15c2–4 requires a showing of (1) Gallagher's violation; (2) Calvo's "knowledge" of the violation; and (3) Calvo's substantial assistance in the violation. *IIT, An Int'l Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980) (Friendly, J.). *See also Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119 (2d Cir. 1982); *Woodward v. Metro Bank,* 522 F.2d 84, 97 (5th Cir.1975); *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 660 F.Supp. 1362, 1366 (D.Conn.1987) (Ruling on Motions for Summary Judgment). Where there is a duty of disclosure to the defrauded party, reckless conduct satisfies the scienter requirement for aider and abettor liability. *See Sirota,* 673 F.2d at 575 (aiding and abetting violation of Section 10(b)); *Decker,* 681 F.2d at 119; *IIT,* 619 F.2d at 923; *SEC v. Spectrum Corp.,* 489 F.2d 535, 541 (2d Cir.1973).

■ A fiduciary duty is not a prerequisite to the use of recklessness as the standard by which scienter is proven in a case of aider and abettor liability. Attorneys may be liable as aiders and abettors where, if it is reasonably foreseeable that potential investors will rely on documents they draft, they omit material information or include erroneous information in reckless disregard of the truth. *Morgan v. Prudential Group, Inc.,* 527 F.Supp. 957, 961 (S.D.N. Y.1981), *aff'd mem.,* 729 F.2d 1443 (2d Cir. 1983). "Attorneys have a responsibility to not act in reckless disregard of the truth when using the information provided by clients in performing their professional duties and preparing offering memorandum and ... opinions" in connection with a securities offering. *Andreo,* at 1367. This is especially true where the Commission seeks an injunction which does not require proof of reliance upon reckless statements. *Blavin,* 760 F.2d at 711.

■ A defendant need only be shown to have been negligent in the omission or falsity of a statement of material fact or, as to whether a transaction or practice "would operate as a fraud or deceit upon the purchaser" of a security, to prove violations of Section 17(a)(2) and (3) respectively. *Aaron,* 446 U.S. at 697, 100 S.Ct. at 1955 (negligence standard for violations of Section 17(a)(2) and (3)).

### B. *The Warehouse Closing*

The Commission's motion for summary judgment on Counts I, II and III is based upon Calvo's participation in the Warehouse offering and, in particular, in the closing of that offering on April 22, 1985. It is not disputed that the prospectus represented that the offering would remain open for not in excess of 150 days from the effective date of the prospectus and that all investor funds would be returned if the specified minimum number of shares were not sold and paid for by the end of that period. *See* Bremer Affidavit, Exhibit 4 (Prospectus); Calvo Transcript at 27, 67. The prospectus also represented that Warehouse would realize at least $964,000 if the minimum number of shares were sold. Prospectus at 2. The period of the offering was extended to 150 days by agreement of Gallagher and Warehouse, making the proper closing date April 7, 1985. *See* Bremer Affidavit, Exhibit 6; Calvo Transcript at 67–68.

As the termination date approached, sales of Warehouse stock were far below the minimum specified in the prospectus. Bremer, Russ Gallagher and Granai devised a scheme to give the appearance that the minimum had been sold. Short term loans were obtained and the proceeds were deposited into the escrow account at Barnett Bank. *See* Bremer Affidavit, ¶¶ 22–

23; Calvo Statement and Argument on Material Facts at 5, 9. After the closing, the funds in the escrow account were used to repay the loans and a fee to the lenders, who neither bought nor intended to buy stock in Warehouse. Bremer Affidavit, ¶¶ 23–24.

Granai contacted Dean Sholl, who lent $220,000. Bremer Affidavit, ¶ 23. Bremer contacted several lenders, including Raymond Crane, who lent $220,000, and Marvin Richmond, who lent $250,000. *Id.* ¶¶ 23, 33. Each of the lenders wired funds to Barnett Bank on April 22, 1985, the day of the closing. The escrow account thereby reflected more than the minimum balance specified in the prospectus, whereupon the offering was closed. On April 22, at Granai's instruction, Calvo prepared and delivered to Barnett Bank a letter which authorized the bank to release the escrow funds. Bremer Affidavit, Exhibit 9; Calvo Statement and Argument on Material Facts at 8; Calvo Memorandum of Points and Authorities at 5. The letter instructed Barnett Bank to pay Richmond $324,350, to disburse $25,000 to Calvo as his fee, and to disburse other funds from the escrow account to Gallagher, and Granai as trustee for Warehouse. Bremer Affidavit, Exhibit 9; Calvo Transcript at 81–82, 115. Of the funds released to Granai for Warehouse, $220,000 was paid to Sholl and $260,000 to Crane. Bremer Affidavit, ¶¶ 39, 41; Exhibits 10, 11, 12, 13. The net result of these transactions was that Warehouse received, from the offering, approximately $130,000 and not the $964,000 specified in the prospectus.

The Commission claims these loans did not constitute proceeds of bona fide sales of stock to public investors, but rather constituted a "device, scheme, or artifice to defraud," in violation of Section 17(a)(1), Section 10(b), and Rule 10b–5. Moreover, in violation of Section 10(b) and Rule 10b–9, the closing on April 22 and the use of the money in the escrow account rendered false the representations in the prospectus that the investors' money would be returned if the minimum number of shares

were not sold within the 150–day period and that the corporation would receive $964,000 from the stock sale. The prospectus cast the offering as made on a "minimum or none" basis, i.e., the sale would be consummated only if the minimum number of shares were sold. As all the securities were not "sold at a specified price within a specified time," nor was "the total amount due to the seller ... received by him by a specified date," Rule 10b–9(a)(1), the terms of the prospectus required that all funds paid in be returned to the investors. The failure to do so violated Rule 10b–9 and Rule 10b–5. The Commission argues that Calvo aided and abetted Gallagher, the underwriter, in violating Rule 15c2–4 because the investors' funds were not "promptly transmitted or returned to the persons entitled thereto" and the escrow agreement did not bind Barnett Bank to return the funds to the investors when the offering was not closed until after 150 days from November 8. Rule 15c2–4(1) and (2).

Calvo does not present any facts which dispute that sham loans were used to create the illusion of fulfillment of the terms of the prospectus and ostensibly to warrant the closing of the offering; that the offering was extended beyond the 150–day period; or that these acts constitute violations of the securities laws by Bremer, Granai, Gallagher, and others. Rather, he claims that disputed issues of material fact exist as to whether, with scienter, he participated in closing the offering based on the sham loans and in allowing the offering to close after the 150–day period.

### C. *Temporary Loans*

On the issue of scienter, the Commission relies heavily upon affidavits of Bremer and Richmond.[11] According to Bremer, when it appeared that the minimum shares of stock would not be sold, Calvo suggested that the offering could be closed through the use of "emergency money" and supplied the names of two persons who might supply such money. Bremer Affidavit at 21. Bremer also states that Calvo discussed temporary loans as a means of

---

**11.** Both Bremer and Richmond have consented to the entry of injunctions as to them.

closing the offering in meetings with Bremer, Granai and Russ Gallagher, one of which took place at Calvo's office on April 19, 1985. Bremer Affidavit, ¶¶ 22, 25. Richmond's affidavit states that Bremer solicited a short-term loan from him of $250,000 for the purpose of closing the offering. Richmond Affidavit, ¶¶ 5, 9. He was given the name and telephone number of Calvo, whom he called to confirm the conditions of the loan. Richmond Affidavit, ¶¶ 7, 8.

■ To rebut this showing, Calvo offers his testimony before the Commission in which he denies any knowledge of the Sholl and Crane loans and denies that any loans were ever discussed in his presence. *See* Calvo Transcript at 96 (Crane loan), 98–102 (Sholl loan). In addition, he cites the affidavits of Herman Burkhardt and David Jordan,[12] as contradicting Bremer's claims that he contacted Burkhardt and Jordan to obtain loans at Calvo's suggestion. *See* Bremer Affidavit, ¶ 21. Burkhardt states that he has never spoken to Bremer and was not approached by him to help close the offering. Burkhardt Affidavit, ¶¶ 4, 7. Similarly, Jordan states that he was contacted by Bremer only in an attempt to find investors for Warehouse stock, that he was not asked to obtain "emergency money," and that Bremer told him he had gotten Jordan's name from Russ Gallagher. Jordan Affidavit, ¶¶ 3, 5, 7.

Calvo acknowledges that he authorized the payment to Richmond and that he spoke to Richmond to confirm that the payment would be made. Calvo Transcript at 83. Calvo also does not dispute that Richmond indicated that he would be wiring money into the escrow account which was "going in with one hand and out with the other." *See* Calvo Statement and Argument on Material Facts at 6, 7; Local Rule 9(c). However, Calvo claims that he authorized the payment to Richmond because he was told by Granai (Warehouse's counsel) that Richmond had bought an account receivable from Bremer. Calvo Transcript at 81. According to Calvo, the account represented a loan which Bremer had made to Warehouse to cover prepaid advertising and promotional expenses incurred by Bremer Advertising on behalf of Warehouse. Calvo Transcript at 73–83.[13] Calvo claims that his reliance upon Granai's instructions creates a genuine issue as to whether his conduct in authorizing the Richmond payment was knowing, reckless or negligent.

Calvo's testimony with respect to the Sholl and Crane loans is directly in conflict with Bremer's assertions. Except for Bremer's assertions, the Commission presents no evidence that Calvo had notice, or should have had notice, of the improper transactions. *See* Plaintiff's Statement of Material Facts, ¶¶ 40, 42, 48, 50 (referring to Bremer affidavit to support Calvo's knowledge of the Sholl and Crane loans). The Commission does not claim that Calvo personally contacted any of the lenders or otherwise arranged any of the loans. The

---

**12.** Calvo also introduced unsigned, unsworn documents purported to be transcripts of telephone conversations between Bremer and others. Calvo received these from the Commission, which transcribed them from tape recordings obtained from Bremer. The Commission objects to the transcripts as hearsay and unauthenticated and thus not to be considered under Rule 56(e).

Unsigned, unsworn, unauthenticated transcripts are not generally admissible. *See, e.g., Cauble v. Mabon Nugent & Co*, 594 F.Supp. 985, 995 (S.D.N.Y.1984). To be admissible, it must be shown that the material can be reduced to admissible form. *See United States v. Dibble*, 429 F.2d 598, 602 (9th Cir.1970) (documents must be authenticated). Calvo contends that the transcripts are non-hearsay as offered only to impeach Bremer's credibility. Used for this pur-

pose, the transcripts would not establish a genuine issue as to Calvo's recklessness in directing the release of escrow funds to Richmond, in allowing the offering to close late, nor in failing to disclose the Bremer indictment. *See* Calvo Memorandum at 9–12. The grant of summary judgment is based not on Bremer's testimony as to Calvo's knowledge and participation, as to which there is a credibility issue, but on documents which Calvo concedes are genuine and Calvo's own testimony as to facts within his knowledge and control. The transcripts do not rebut plaintiff's showing as to Calvo's recklessness.

**13.** Bremer Advertising was wholly owned by Edward Bremer. Bremer Advertising never performed advertising work for Warehouse and there were no plans for it to do so.

affidavits of Jordan and Burkhardt tend to support an inference that Calvo was not aware that Bremer was seeking loans from them for the purpose of closing the offering. The inferences must be resolved in Calvo's favor and summary judgment may not be based on a responsibility for the Sholl and Crane loans.

■ However, Calvo raises no issue of material fact with respect to his recklessness with respect to the Richmond payment. Calvo concedes that Richmond spoke to him to confirm that a payment of $324,350 would be made to Richmond directly from the escrow account and that Richmond told Calvo he was wiring money into the escrow account. With no more confirmation than Granai's oral instruction and explanation that the payment was for an account payable, Calvo authorized release of nearly one-third of the offering proceeds to Richmond, an amount which was $74,350 in excess of Richmond's payment into the corporation. Calvo made no inquiry as to why Richmond was wiring money to the escrow account (and not to Bremer from whom Richmond was purportedly buying the account receivable) on the same day that he was to receive payment of the account receivable. Nor did he ask for documentation of the Bremer–Richmond or Bremer–Warehouse transactions. Calvo Transcript at 74–75.

Nothing in the three post-effective amendments to Warehouse's registration statement, which Calvo reviewed, and for which he bears at least partial responsibility, or in the prospectus informed investors that Bremer was owed a large account payable by Warehouse, nor that such an amount would be paid from the proceeds of the closing. The investors were also not informed that Bremer Advertising would undertake, or had undertaken, advertising services for Warehouse.[14] The omission of these facts from the prospectus and registration statement cause those documents to be materially misleading. *TSC v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.

2d 757 (1976) (fact is material as a matter of law if it is "so obviously important to an investor that reasonable minds cannot differ on the question"). Thus, assuming that Calvo did rely upon Granai's explanation, the explanation itself should have put him on notice that authorizing the payment to Richmond made the prospectus materially misleading and that the payment was part of a fraudulent device to close the offering. Releasing the funds in reliance upon the information provided by Warehouse's counsel, without any investigation, constituted recklessness sufficient to support liability under Sections 17(a)(1) and 10(b) and Rules 10b–5 and 10b–9. *See Blavin*, 760 F.2d at 711 (reliance on corporate information in recommending securities was reckless); *Coven*, 581 F.2d at 1029 (attorney's letter reckless where no basis for his representation as to number of shares sold). Even drawing all permissible inferences in Calvo's favor, Calvo's act in authorizing the payment to Richmond was "an extreme departure from the standard of ordinary care" for a person in his position as attorney for the underwriter. *Blavin*, 760 F.2d at 711. Further, even if the dubious, if not wrongful, basis for the transaction was not known to Calvo, there is no question but that he knew the transaction was taking place and that it was not disclosed in either the prospectus nor in the registration. That knowledge and his failure to rectify the nondisclosure constituted recklessness as a matter of law.

D. *Extension of the Offering Period*

■ The Commission also maintains that Calvo acted either knowingly or recklessly in allowing the offering to continue beyond the 150–day period represented in the prospectus. Calvo conceded that he was aware of the 150–day limitation. Calvo Transcript at 68–69. Calvo reviewed the Post-Effective Amendment No. 3 to the registration statement, which Warehouse filed with the Commission and which in-

---

**14.** The prospectus estimated that $28,487 of the proceeds would be spent for advertising and $312,132 for printing and mailing of catalogs. Prospectus at 7–8. However, there was no indication in the prospectus that Bremer would advance these funds to Warehouse or that Bremer Advertising would perform any services for Warehouse.

cluded a draft of the prospectus stating that the period of the offering was to be measured "from the date of this Prospectus." Calvo Transcript at 37; 68–69; Exhibit 1 at 4. After the amendment was filed, the Commission notified Nina Gordon, an attorney employed by Calvo, that the offering had been declared effective on November 8, 1984. Crespo Affidavit, ¶ 5; Calvo Memorandum in Support at 2–3. The prospectus was printed bearing this date prominently on the first page. See Bremer Affidavit, Exhibit 4. As attorney for the underwriter, Calvo supplied and reviewed the form for the escrow agreement between Gallagher and Barnett Bank. Calvo Transcript at 46–74; Calvo Statement and Argument on Material Facts at 1–2. The escrow agreement did not set a specific date for closing the offering, but provided that the period of the offering would be measured from the "Effective Date of the Offering." Bremer Affidavit, Exhibit 2, ¶ B. As a specialist in securities law, Calvo was fully aware of the importance of the 150–day limit as protection for the investors. See Calvo Transcript at 20, 26–27 (previous experience with minimum-maximum and all-or-none offerings).

In February 1985, Calvo received a letter from Barnett Bank setting the date for the termination and closing of the offering as April 22, 1985, about two weeks after the offering should have been terminated. Jackie Hill Affidavit, Exhibit D; Bremer Affidavit, Exhibit 7; see Calvo Transcript at 66. Calvo also knew that funds were being deposited into the escrow account up to the morning of the closing on April 22, 1985. Despite this knowledge, Calvo authorized the disbursement of funds to Warehouse, Richmond, Granai, Gallagher, and himself, from the escrow account on April 22. See Exhibit 9.

Calvo contends that a genuine dispute exists as to whether he acted with scienter in authorizing the release of the escrow

funds despite the expiration of the offering period. In support of his contention, Calvo cites his own testimony that he did not know that the effective date of the offering was November 8, 1984, and that he did not know that the April 22 closing exceeded the 150–day limitation. See Calvo Transcript at 67–69; Calvo Memorandum in Support at 22. Calvo also claims either that he relied upon the bank's letter setting the closing for April 22, 1985, see Calvo Response to Plaintiff's Supplemental Memorandum at 17, or that he was not associated with the offering after the filing of Post-Effective Amendment No. 3 because he had been replaced as counsel for the underwriter and, therefore, had no reason to ascertain the proper date for the closing. See Calvo Memorandum in Support at 17.

These contentions raise no genuine issue of fact with regard to Calvo's scienter in authorizing the extended closing. Calvo's actual knowledge of the effective date of the offering is irrelevant to whether his conduct was reckless in violation of Sections 10(b) and 17(a)(1), as well as Rules 10b–5 and 10b–9. Even if the notification to an employee under Calvo's direct control does not charge him with knowledge of the effective,[15] his failure to ascertain the correct effective date, and hence the proper closing date, either when he supplied the escrow agreement form from his files, when he received the bank's letter, or before he authorized the actual disbursal on April 22, was in reckless disregard of the truth or falsity of the representations in the registration statement and the prospectus that the period of the offering would be 150 days. In an offering of the type at issue, the time limitation/escrow mechanism is a major protection of investors. See Blinder–Robinson, 542 F.Supp. at 476; A.J. White v. SEC, 556 F.2d 619, 623 (1st Cir.), cert. denied, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). Calvo's argument, in effect, is that he made no effort to

---

**15.** The finding that Calvo was reckless in not ascertaining the effective date and hence the proper closing date makes it unnecessary to determine whether notice to Calvo's employee charges him with constructive knowledge of the effective date. See Corp. de Mercadeo Agricola, 608 F.2d 43 (2d Cir.1979) (general rule that notice to agent is notice to principal; cf. Blinder–Robinson, 542 F.Supp. 468, 479 (D.Colo.1982) (underwriter responsible for employee's actions under direction of firm).

ensure that the closing time was observed and thus lacked knowledge. The date involved a simple arithmetic calculation from the date on the front of the prospectus. *See Kiernan v. Homeland,* 611 F.2d 785, 788 (9th Cir.1980) (recklessness may be found where defendant failed to obtain facts despite ability to do so without extraordinary effort). Indeed, Calvo presents no evidence that he ever considered the 150-day limitation or made any effort to ensure its observance, despite his awareness of its importance. His argument presumes that he had no obligation to assure the correctness of the information on which he caused others to act with an adverse impact on the investors. In this respect, he is in error.

Calvo wrote and delivered the letter authorizing the closing and the release of funds on April 22, without any factual basis for the representations that Richmond was entitled to $324,000 of the proceeds and that the offering could properly close on that date. The letter was reckless as to the truth of these statements and was a violation of Sections 17(a) and 10(b) and Rule 10b-5. *See Coven,* 581 F.2d at 1029 (attorney's letter representing amount of sales in all-or-none offering was reckless where written without basis); *Blavin,* 760 F.2d at 711. Moreover, in authorizing the closing, Calvo violated Rule 10b-9 by acting with reckless disregard of the truth or falsity of the representations in the prospectus and registration statement that the funds would be returned to investors if the minimum number of shares was not sold in bona fide transactions within 150 days of the effective date. The writing of the letter also substantially facilitated the late closing by authorizing Barnett Bank to release the escrow funds. *See SEC v. National Student Marketing,* 457 F.Supp. 682, 713 (D.D.C.1978) (failure to delay merger until adjusted financial data could be disclosed to investors—substantially facilitated violation). Calvo should have known that his letter would lead to what the most modest of inquiry would have shown was an illegal and fraudulent clos-

ing. Thus he is liable as an aider and abettor to the underwriter's violations of Section 15(c) and Rule 15c2-4. *Coven,* 581 F.2d at 1029 (attorney failed "to take even the first step to guarantee compliance" with escrow agreement and registration statement while assisting closing of offering). *See Andreo,* at 1367. There is no genuine issue as to the material fact of Calvo's recklessness as to the specified period of the offering and as to the Richmond payment. In writing the authorization letter and participating in the closing, he violated the indicated securities laws.

Accordingly, summary judgment is granted in favor of the Commission on Counts I, II and III.

## II. COUNT V

### A. *The Bremer Indictment*

█ The Commission moves for summary judgment on Count V, which alleges that Calvo violated Sections 10(b) and 17(a) and Rule 10b-5 by failing to disclose the material fact that Bremer, the founding president of Warehouse, had been indicted on charges of mail fraud.

Calvo does not dispute the Commission's version of the events with respect to the Bremer indictment. Rather, he contends that the circumstances of his failure to disclose the indictment raise a question for the trier of fact as to the reasonableness of his conduct. *See* Calvo Statement and Argument on Material Facts Which are in Dispute at 9.

On March 8, 1985, Bremer was indicted by a federal grand jury on charges of mail fraud. Calvo was informed of the indictment by Warehouse's counsel, Granai, in March. *See* Calvo Factual Statement at 4; Calvo Transcript at 133–34, 146. Calvo considered the indictment a material fact. Calvo Factual Statement at 4; Calvo Admission No. 56. He suggested to Granai that Bremer should resign and that a post-effective amendment be filed to disclose the indictment and was told by Granai that Bremer would resign and an amendment would be filed.[16] *See* Calvo Transcript at

---

**16.** Ordinarily, the proper method of disclosure

of a post-effective material change of circum-

134–35. Calvo did not advise that sales be suspended pending the disclosure. He did nothing to cancel the offering. Calvo Transcript at 139; 135–36. With full knowledge of what was happening, Calvo took no action to protect the investors by rectifying the action taken in the registration and sale. His position obliged him to act. His failure to do so violated his duty to the investors.

Bremer did not resign. Warehouse filed no post-effective amendment disclosing the indictment. Calvo knew these facts before the closing. He claims he was told by Granai that the indictment would be "dropped," Calvo Transcript at 149–50, but he made no attempt to verify that this had occurred. *Id.* at 151. On April 22, 1985, the day of the closing, Granai gave Calvo an open letter signed by Granai for Granai & Hauslib, P.C., which was general counsel to Warehouse, addressed to Calvo's client, Gallagher, and which stated in part:

> The Registration Statement and the Prospectus ... comply as to form in all material respects with the requirements of the Securities Act, the Securities Exchange Act of 1934 and with the rules and regulations of the Commission thereunder and the descriptions in the Registration Statement and Prospectus, or any such amendment or supplement, or contracts and other documents are accurate in all material respects, *except as may be required, if required, at all, (as to which our firm expresses no opinion)* by the recent proceeding brought against Mr. Bremer, a copy of which is attached.

Bremer Affidavit, Exhibit 19, ¶ 5 (emphasis added). Calvo was thus informed that the indictment had not been dropped. At best, Granai and Bremer expected that the indictment would be "dropped" upon Bremer's agreement to cooperate with the government in testifying. Calvo Transcript at 152–54. Calvo did nothing to veri-

fy this information with Bremer's criminal attorney or with the United States Attorney. *Id.* at 155. Calvo insisted that Granai strike the underlined portion quoted above and add, after the quoted portion: "It is our opinion, based upon our review of the proceeding and evidence to date that there is little likelihood that the government will prevail in this matter." *See* Calvo Transcript at 152–53; Exhibit 19. After receiving the amended opinion letter, Calvo authorized the release of the funds.

Calvo argues that his claim of reliance upon Granai's assurances that Bremer would resign and that the indictment would be dropped raise an issue of fact as to the reasonableness of his conduct. He contends that the indictment need not have been disclosed if it were certain to be dropped. *See* Calvo Memorandum in Support at 18. Calvo also argues that he personally had no duty to disclose the Bremer indictment. These contentions are meritless. An indictment for mail fraud of the president and founder of the issuing corporation was a fact that any reasonable investor would have considered important in making the decision to invest in Warehouse. *TSC v. Northway*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (defining standard for summary judgment on issue of materiality); *Basic Inc. v. Levinson*, —— U.S. ——, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (adopting *Northway* standard of materiality for Section 10(b) actions). Indeed, the prospectus, at 4, stated:

> The Company is completely dependent upon the personal efforts and abilities of its chief executive officer, Edward W. Bremer, who is devoting and will devote his entire time to the Company's day-to-day activities.... The loss or unavailability of the services of ... Messrs. Bremer ... would have a materially adverse effect on the Company's business and/or potential earning capacity.

stances is through a sticker on the prospectus, not by amending the registration statement. *See SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1095 n. 14 (2d Cir.1972). Even if Calvo first learned on April 22 that the indictment had not been dropped, too late for either a sticker or an amendment, the offering could not close, as

the investors had the right to withdraw their investments based on the new information. *See A.J. White & Co.*, 556 F.2d at 623 (if too late to disclose change, investors have right to assume that prospectus would be complied with, not changed).

Bremer's indictment was likely to make him "unavailable" to Warehouse, either through his proposed resignation, his need to prepare a defense and stand trial, or through the possibility of incarceration. Moreover, it cast a cloud upon the bona fides of Warehouse, which was essentially the alter ego of Bremer. Any investor in Warehouse would have wanted to know that Bremer had been charged with fraud, even if the charge were not prosecuted by reason of his cooperation in a fraud investigation. The pendency of the criminal proceeding was, therefore, a material fact which the law required to be disclosed to investors. *See* Securities & Exchange Commission Regulation S–K Item 401(f)(2), 17 C.F.R. § 229.401(f)(2) (requiring disclosure in registration statements filed with SEC of fact that executive officer of issuer "is a named subject of a pending criminal proceeding" if the event is "material to an evaluation of the ability or integrity of" the officer); *SEC v. Century Mortgage Co.,* 470 F.Supp. 300, 306 (D.Utah 1978); *cf. SEC v. Freeman,* CCH Dec. ¶ 96,361 at 93,244 (N.D.Ill. Mar. 3, 1978) [available on WESTLAW, 1978 WL 1068] (prior history of proceedings against dominant figure in small, closely held enterprise for security law violations is material and must be disclosed). Calvo cites no authority for his contention that, because he was told the pending indictment would be "dropped" at some future time, it was not material to Bremer's ability and integrity to carry on as Warehouse's president.[17] His argument in this regard is specious and suggests an obliviousness to his obligations, quite in keeping with his conduct being deemed a reckless indifference to his obligations to investors.

In addition, Granai's representation was no more than a prediction of the resolution of the indictment. Granai did not represent Bremer on the criminal matter at the time. Calvo did not know that Granai had spoken directly either to Bremer's defense attorney or to the prosecutor about the charges. Calvo Transcript at 155. He made no effort to verify the prediction and did not insist that Bremer resign. Moreover, Granai's opinion letter originally took no position on the materiality of the indictment. Because Calvo himself insisted that the opinion letter be amended to reflect, as Granai's view, that the indictment was not considered material, he thus then knew the facts and chose to ignore the obvious materiality of them and he cannot now hide behind Granai's assurances. Scienter with respect to this issue is found, as a matter of law, based on Calvo's knowledge of facts which he had to have known were material and which thus had to be disclosed.

Thus, there is no genuine issue of fact but that, at the release of the funds, Calvo knew of the indictment, that it had not been dismissed, and that it had not been disclosed to investors in the prospectus or the amended registration statement. In the failure to disclose material facts, those documents were misleading. Calvo's conduct in authorizing the closing, absent such disclosure, was at least reckless.

If Calvo was not obliged to disclose this information to investors, nonetheless, without question, he was obliged to rectify or prevent the continuation of the misinformation of the inventors. There is no factual support for Calvo's assertions that he was no longer counsel for the underwriter, Gallagher, at the time of the closing. *See* Calvo Memorandum in Support at 17. Up to the closing and at the closing itself, Calvo consulted with Granai and Bremer, acted on Gallagher's behalf and wrote the letter which triggered the release of funds from escrow. He reviewed the Granai opinion letter, which was addressed to Gallagher, and demanded and obtained changes. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 809 (2d Cir. 1975) (defendant responsible for statements where he suggested changes in language). The only reasonable inference which can be drawn from these undisputed facts is that

---

**17.** Calvo made no effort to utilize the procedure referred to in the Instructions to Paragraph (f) of Item 401. This procedure provides that, where an event specified in Paragraph (f) is omitted from the Commission's filings on the ground that it is not material, the registrant may furnish the Commission with supplemental information explaining the omission.

Calvo was still acting as Gallagher's counsel at the time of the closing.

Even if Calvo's position as counsel to the underwriter did not impose on him a duty of disclosure or to rectify the misrepresentation, such duty existed by reason of his substantial participation in the offering. He prepared the first post-effective amendment to the registration statement and reviewed the second and third. He wrote and delivered the letter which authorized the release of funds from escrow. It was actually intended, but in any event it was entirely foreseeable that the bank would rely upon his letter to close the offering and release the funds rather than returning them to the investors. *See Andreo*, at 1367 (discussing foreseeability standard used to determine the scope of the duty owed by attorneys and accountants); *Morgan*, 527 F.Supp. at 961 (foreseeable reliance on attorney's opinion creates duty); *National Student Marketing Corp.*, 457 F.Supp. at 713 (silence of corporate attorneys as to material fact while allowing merger to close). Moreover, since Calvo's fee was paid directly from the escrow account, he personally benefited from the non-disclosure and the closing. His substantial participation and direct personal benefit clearly created a duty to disclose material facts to investors, to rectify the non-disclosure, or to prevent or attempt to prevent the closing and disbursement of the funds while the investors were misinformed.

The Commission has demonstrated the absence of any issue of material fact with respect to Calvo's scienter in the failure to disclose the Bremer indictment. He had a duty to the investors. He violated that by failing to disclose the fact of the indictment and by allowing the offering to be closed without that disclosure. His conduct was reckless as a matter of law and violated Sections 17(a) and 10(b) and Rule 10b–5.

Accordingly, the Commission's motion for summary judgment on Count V is granted.

### *Propriety of Injunctive Relief*

To obtain a permanent injunction against Calvo, the Commission must show a reasonable likelihood of future violations of the securities law. *Murphy*, 626 F.2d at 655; *Research Automation Corp.*, 585 F.2d at 36. A permanent injunction may be granted on summary judgment, given a proper record. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir.1980), *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981), as amended CCH Securities Law Reporter, ¶ 97,301 at 97,071; *see Research Automation Corp.*, 585 F.2d at 33–34, 36. On summary judgment, the Commission must establish that there is no genuine issue of fact material to the granting of the injunction. *Murphy*, 626 F.2d at 655.

In determining the propriety of injunctive relief for violations of securities laws, several factors are relevant to the likelihood of future violations. *See, e.g., SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *SEC v. Scott*, 565 F.Supp. 1513, 1536 (S.D. N.Y.1983), *aff'd*, 734 F.2d 118 (1984); *see generally Manor Nursing Centers*, 458 F.2d at 1100–03. These include:

(1) The existence and nature of past violations, including the degree of scienter and whether the violations were isolated or recurrent. *Manor Nursing Centers*, 458 F.2d at 1100; *SEC v. Murphy*, 626 F.2d at 655; *see SEC v. Scott*, 565 F.Supp. at 1536 (degree of scienter); *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8 (2d Cir.1977).

(2) Defendant's recognition of the wrongful nature of his conduct. *Manor Nursing*, 458 F.2d at 1101; *SEC v. MacElvain*, 417 F.2d 1134, 1137 (5th Cir.1969), *cert. denied*, 397 U.S. 972, 90 S.Ct. 1087, 25 L.Ed.2d 265 (1970).

(3) The cessation of the wrongful conduct. *Cf. SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir.1975) (cessation of illegality does not require denial of injunction).

(4) Defendant's opportunity to engage in future violations through his occupa-

tion or business. *Manor Nursing Centers*, 458 F.2d at 1102.

(5) The sincerity of defendant's assurances against future violations. *Murphy*, 626 F.2d at 656; *see, e.g., SEC v. Bausch & Lomb, Inc.*, 565 F.2d at 18–19.

(6) Hardship and other equitable considerations. *Cf. Manor Nursing Centers*, 458 F.2d at 1102 (hardship and other equitable factors are factors to be considered, but public interest is paramount).

### 1. Nature of the Violations

Defendant argues that the Warehouse offering was a one-time event in which the impropriety originated with Granai and Bremer. He also dismisses the seriousness of the violations and claims to have prevented Bremer from committing even more serious violations. However, the standard for injunctive relief is not a matter of comparative culpability, but of the likelihood of future violations by Calvo and whether he must be enjoined for the protection of the public. Calvo's reckless conduct was a substantial factor in furthering the violations. His recklessness reflects an attitude sufficient to warrant an injunction. Calvo profited in that, by allowing the offering to close, his law firm received a $15,000 fee from the escrow funds which probably would not otherwise have been paid, a probability of which, by reason of the insufficient sale of stock, was all the more likely. Calvo Memorandum in Support a 2; Calvo Transcript at 36. The seriousness of the violations is reflected in Warehouse's now defunct status and the investors' substantial losses, the result of the fraudulent offering.[18]

### 2. Defendant's Recognition of Wrongfulness

Calvo has made no concession of the wrongfulness of his conduct and loses no opportunity to blame others for the violations. *See Research Automation*, 585 F.2d at 36. Moreover, his claim that he was removed as the underwriter's counsel after the filing of Post–Effective Amendment No. 3 to the registration statement is wholly without factual support, given his participation at the closing; his consultations with Granai and Bremer with respect to the Richmond loan; the directive to Barnett Bank to release the escrow funds; and the Bremer indictment and opinion letter.[19] Thus, he persists in asserting an unfounded claim, hardly a reflection of straightforwardness.

### 3. Cessation of the Wrongful Conduct

The offering was not a continuing activity, nor is there any evidence that Calvo has engaged in other securities violations since the offering was completed. However, the absence of ongoing improper activity does not preclude an injunction, because from past recklessness, one may reasonably be concerned about future violations, *Murphy*, 626 F.2d at 655, especially where the defendant made no effort to undo the violations by cooperating with the Commission and the temporary receiver in their attempt to recoup the investors' lost funds. *Cf. Manor Nursing Centers*, 458 F.2d at 1100 (defendants made no attempt to cease or undo the effects of their unlawful activity until the institution of investigation). There is no showing of any such effort by Calvo and he has only belatedly agreed to make restitution to the receiver. He has manifested no contriteness and he portrays a callous indifference.

---

**18.** The temporary receiver has recovered a portion of the funds, but investors apparently will not be fully reimbursed. *See Strauss v. Crane,* Civil No. H–86–613 (D.Conn.) (Supplement to Application for Order of Notice and Disbursement, December 10, 1987).

**19.** The Commission contends that Calvo's continued defense of this action, where other defendants have capitulated, demonstrates Calvo's failure to recognize his misconduct and the

need for an injunction. To the extent Calvo's defense merely put the Commission to its burden of proving an injunction justified, he cannot be penalized for doing so. *National Student Marketing Corp.*, 457 F.Supp. at 717, n. 75 (defense of litigation does not weigh against defendant in absence of dilatoriness or bad faith). However, the court has previously noted that Calvo's conduct of this litigation has reflected no desire or effort to reduce delay.

### 4. Opportunity to Commit Further Violations

Calvo is a registered securities attorney and participates in similar public offerings. Thus, he will be in a position where future violations of the securities laws may occur. His claim that the Commission has singled him out for scrutiny and will closely examine any transactions in which he participates is irrelevant. An injunction will assist the Commission in enforcing the federal securities laws. An injunction can be a reasonable aid in the Commission's enforcement of the law considering the violations that might occur given Calvo's future opportunity to do so.

### 5. Sincerity of Defendant's Assurances Against Future Violations

Calvo represents that he intends no further violations and argues that an injunction would deny him an opportunity to demonstrate his good faith and sincerity. The latter is a bootstrapping argument. He has filed one affidavit attesting to his good character and trustworthiness. See Affidavit of Francesca Daniels at 12. As self-serving, his disclaimer by affidavit would not meaningfully add to his brief. See Murphy, 626 F.2d at 656 (injunction granted on summary judgment despite affidavit by defendant promising to comply with securities laws in future). Calvo's credibility and character, notwithstanding present assertions, are problematical given his prior conduct.

■ A defendant may not avoid an otherwise warranted injunction by promising to refrain from future securities violations. Id. at 656; cf. SEC v. Management Dynamics, Inc., 515 F.2d at 807 (injunctive relief not barred by defendant's disclaimer). Summary judgments granting injunctions have been granted in numerous cases in which a defendant has affirmed his good faith. See, e.g., SEC v. Bonastia, 614 F.2d 908, 914 (1980) (remanding for issuance of injunction). Lack of sincerity is only one of several factors to be considered in the context of the "totality of circumstances" in determining whether an injunction should issue. Murphy, 626 F.2d at 656.

### 6. Hardship and Other Equitable Factors

■ Although the securities injunction is a "creature of statute," a court may appropriately consider equitable factors in exercising its discretion to grant or deny such an injunction. See Management Dynamics, 515 F.2d at 808. Thus, the court may assess "all those considerations of fairness that have been the traditional concern of equity courts." Manor Nursing Centers, 458 F.2d at 1102 (considering harmful impact on defendants' in their legitimate business and professional activities). Calvo maintains that an injunction would create excessive hardship for him and for his family. The potential effect of an injunction on Calvo's family and business, a speculation at best and essentially irrelevant, does not outweigh the need for the public's protection against the likelihood of future violations. "[T]he public interest, when in conflict with private interest, is paramount." SEC v. Culpepper, 270 F.2d 241, 250 (2d Cir.1959).

Calvo has also made numerous accusations against the Commission and its conduct in the investigation and litigation of this case. Most of these accusations are contained in defendant's unsworn memorandum of counsel and are not properly before the court on a motion for summary judgment. These unsworn allegations have not been considered. However, Calvo has filed a motion to supplement his pleadings, seeking a counterclaim against the Commission, alleging, in part, that agents of the Commission have harassed Calvo and that they have made representations to a third person that he has already been enjoined by the Commission in this action. See Supplemental Amendment and Counterclaim, ¶ 4. Those matters are irrelevant to the justification of injunctive relief.

The Kettler affidavit is troubling. Kettler, a client of Calvo, states that he was asked by an investigator and an attorney of the Commission's Chicago office, in the course of a conversation about his securities activities, whether he knew "that Mr. Calvo had been 'enjoined' by the Securities

and Exchange Commission in Boston." Kettler Affidavit, ¶ 7. This charge, if true, may raise a serious question of the conduct of one or more of the Commission's employees. If such an abuse of conduct by the Commission's employees has occurred, it is not, however, material to the question of injunctive relief.

 It is found, after consideration of all the material factors, that there is not sufficient likelihood that Calvo will not commit such violations in the future. An injunction shall, therefore, issue restraining Calvo from violating those sections of the securities laws which he violated in participating in the Warehouse closing.

SO ORDERED.

## ON MOTIONS TO SUPPLEMENT PLEADINGS and FOR PRELIMINARY INJUNCTION

Defendant William A. Calvo, III moves to file a counterclaim and two affirmative defenses, and for a preliminary injunction restraining plaintiff, Securities and Exchange Commission ("SEC" or "Commission") from making certain communications to third persons.

### Facts and Procedural History

In March 1986, the Commission brought this action for injunctive relief against ten defendants, including Calvo, alleging violations of federal securities law in connection with a public offering of stock of The Electronics Warehouse, Inc. ("Warehouse"). The offering, in which Calvo served as attorney for the underwriter, became effective in November 1984 and terminated in April 1985. The Commission claimed that Calvo participated in a scheme whereby sham loans were used to state falsely the claimed sales of Warehouse stock above the minimum required to meet the terms of the offering as represented to the investors. The SEC also claims that Calvo assisted in closing the offering beyond the time represented to the investors and that he withheld material information from the investors.

Calvo's proposed counterclaim and affirmative defenses are based upon alleged misconduct of agents of the Commission, which he maintains has denied him due process. The counterclaim alleges that in April 1987 an agent of the Commission "expressly and impliedly indicated" to a client of Calvo that Calvo "had been enjoined by the S.E.C. in this action." Proposed Counterclaim, ¶ 5. Calvo further alleges that the Commission has harassed and attempted to intimidate him and that as a result he has suffered emotional, business and reputational damages. *Id.*, ¶¶ 10, 12. Calvo seeks relief in the form of dismissal of the SEC action and an injunction to bar the Commission from communicating to third persons any claim that Calvo has been enjoined by any court or that he should not be hired as an attorney. Calvo's motion for preliminary injunction seeks to enjoin the Commission from the same conduct.

### Motion to Supplement

 Pursuant to Rule 15(d) and 13(e), Fed.R.Civ.P., Calvo seeks leave to add the proposed counterclaim and two affirmative defenses to his answer. Rule 15(d) provides that the court may "upon reasonable notice and upon such terms as are just, permit [a] party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." The allowance of a supplemental pleading is within the discretion of the court, considering all the particular circumstances of the action and the pleading offered. *Friedman v. Typhoon Air Conditioning*, 31 F.R.D. 287, 289 (E.D.N.Y. 1962); *see also United States v. IBM Corp.*, 66 F.R.D. 223, 227 n. 1 (S.D.N.Y. 1975); *Bates v. Western Elec.*, 420 F.Supp. 521, 525 (E.D.Pa.1976).

The Commission maintains that even were Calvo's supplemental counterclaim allowed under Rule 15(d), 15 U.S.C. § 78u(g) would bar the claim. In the alternative, the Commission argues that the counterclaim should be dismissed because it would hinder and delay the SEC enforcement action, or for failure to state a claim upon which relief can be granted.

Title 15, U.S.C., § 78u(g) requires that "no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission" without the Commission's consent. The SEC has not consented to Calvo's counterclaim. Absent such consent, § 78u(g) has been held to bar the interposition of a counterclaim in an enforcement action brought by the Commission. *See, e.g., SEC v. American Free Enterprise Inst.,* 580 F.Supp. 270, 272 (D.Ariz.1984); *SEC v. Hansen,* No. 83 Civ. 3692, Fed.Sec. L.Rep. (CCH), ¶ 91,426 at 98,120–121 (S.D. N.Y. Apr. 6, 1984) [available on WESTLAW, 1984 WL 2413].

Calvo's counterclaim is not closely bound to the merits of the Commission's claims against him and is likely to delay the final resolution of the enforcement action. The counterclaim deals with events which allegedly occurred in April and December 1987, long after the termination of the offering which forms the basis of the SEC action. Calvo does not claim that the alleged misconduct of SEC employees occurred during the investigation which led to this action, or that the misconduct furnished evidence used by the Commission in this action. *Compare SEC v. Gulf & Western Indus., Inc.,* 502 F.Supp. 343, 346–47 (D.D.C.1980) (denying motion to strike affirmative defense alleging constitutional violations in investigation *prior* to action). Rather, the proposed counterclaim is based on conduct of Commission personnel during investigations of third persons or of Calvo's current activities in the securities field. Injunctive enforcement proceedings such as this one are often protracted and complex. The policy behind § 78u(g) is to promote the speedy resolution of SEC injunctive actions by preventing their consolidation with other actions. *See Hansen,* ¶ 91,426 at 98,121. That policy would be undercut by permitting Calvo's proposed counterclaim.

■ Even were such a counterclaim not barred by § 78u(g), the court would exercise its discretion under Rule 15(d) to deny Calvo leave to assert his supplemental counterclaim. Calvo's claim does not

"arise out of the transaction or occurrence that is the subject matter of the [Commission's] claim" and thus, at most, is a permissive counterclaim. Rule 13(a); *Meinrath v. Singer Co.,* 87 F.R.D. 422, 432 (S.D.N.Y.1980). There is no "logical relationship" between the Commission's claim that Calvo violated securities laws during the Warehouse offering and Calvo's allegations that the SEC has subsequently harassed him. *Id.; see Cyprus Corp. v. Whitman,* 93 F.R.D. 598, 604 (S.D.N.Y. 1982). Moreover, Calvo's counterclaim deals with matters occurring long after this action accrued and was filed.

■ A supplemental, permissive counterclaim should not be allowed where its assertion would prejudice the plaintiff or would confuse or delay the original action. *See Index Fund, Inc. v. Hagopian,* 91 F.R. D. 599, 606 (S.D.N.Y.1981); *Ralli v. Tavern on the Green,* 566 F.Supp. 329, 332 (S.D.N.Y.1983). Calvo's proposed claim comes long after pleadings and discovery have closed and would necessitate new pleadings and discovery. There is also the potential that the pretrial and trial phases of the new claim would prevent speedy resolution of the enforcement action and thereby threaten the effective enforcement of the securities laws to the detriment of the public. *American Free Enterprise,* 580 F.Supp. at 272.

Accordingly, the motion to supplement is denied with respect to Calvo's proposed counterclaim.

*Affirmative Defenses*

■ Calvo's proposed affirmative defenses state

### Defense No. 2

Plaintiff's Complaint should be denied due to unjust and/or unfair and/or unlawful and/or inequitable conduct of Plaintiff, Securities and Exchange Commission, its officers, employees, agents, attorneys, and other persons acting in concert or participation with Plaintiff.

### Defense No. 3

Furthermore, Plaintiff, Securities and Exchange Commission, should be es-

topped from seeking an injunction and other equitable relief on the grounds that he who seeks equity must do equity. The two defenses asserted are vague and conclusory, but they are apparently based upon the same allegations as Calvo's counterclaim. The Commission maintains that the defenses should be stricken as insufficient as a matter of law. *See* Rule 12(f). A defense may be stricken only where it presents no substantial question of law or fact and is insufficient as a matter of law. *See, e.g., Garlock v. New York Tree Savers,* 199 F.Supp. 59 (W.D.N.Y.1961); *Systems Corp. v. ATT,* 60 F.R.D. 692, 694 (S.D.N.Y.1973). However, a defense should be struck when it is clearly "irrelevant and frivolous and its removal from the case would avoid wasting unnecessary time and money litigating the invalid defense." *SEC v. Gulf & Western,* 502 F.Supp. 343, 345 (D.D.C.1980).

▄▄▄ Calvo's supplemental pleading raises defenses of unclean hands and inequitable conduct on the part of the Commission. The defenses of unclean hands and inequitable conduct apply only where there is a direct nexus between the misconduct and the right which is the basis of the suit. *See Warner Bros. v. Gay Toys, Inc.,* 724 F.2d 327, 334 (2d Cir.1983); *International Union, AIWA v. Local Union No. 589,* 693 F.2d 666, 672–73 (7th Cir.1982); *Pierce v. Apple Valley, Inc.,* 597 F.Supp. 1480, 1485 (S.D.Ohio 1984) (no nexus between misconduct during litigation and right government seeks to enforce). Conduct which occurs during the litigation of a lawsuit, rather than during the accrual of the action, cannot form the basis of an equitable defense. *See Pierce,* 597 F.Supp. at 1485; *compare Wellman v. Dickinson,* 79 F.R.D. 341 (S.D. N.Y.1978) (denying motion to strike defense based on misconduct during investigation).

▄▄▄ Moreover, equitable defenses against government agencies are strictly limited. *See Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed. 2d 685 (1981); *Heckler v. Community Health Serv.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1983). The doctrine of unclean hands "may not be invoked against a government agency which is attempting to enforce a congressional mandate in the public interest." *Gulf & Western,* 502 F.Supp. at 348. *See Pan American Co. v. United States,* 273 U.S. 456, 506, 47 S.Ct. 416, 424, 71 L.Ed. 734 (1927) (equitable defense may not be applied to agency where defense would "frustrate the purpose of its laws or ... thwart public policy"). Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level. *SEC v. Masella,* 38 Fed.R.Serv.2d 426, 428 (S.D.N.Y.1983). *See Gulf & Western,* 502 F.Supp. at 347. Moreover, courts have permitted the defense only where the alleged misconduct occurred during the investigation leading to the suit and the misconduct prejudiced the defendant in his defense of the action. *See, e.g., id.* at 346–47; *Pierce,* 597 F.Supp. at 485–86.

There is no nexus between the alleged misconduct and the Commission's allegations against Calvo or the evidence it seeks to introduce against him. Calvo does not claim that the SEC has gathered tainted evidence against him for use in these proceedings or that his ability to litigate this action has been prejudiced by the alleged improprieties. Rather, his claims of prejudice relate to his business and to his relationships with his clients. *See* Counterclaim, ¶¶ 10, 13. Regardless of whether such injuries give rise to constitutional claims for deprivation of liberty or property, maintainable in a *separate* action, they are not the kind of "prejudice" which may be pleaded as an equitable defense to a SEC injunctive action.

Accordingly, Calvo's motion to supplement his pleadings is denied in its entirety.

*Motion for Preliminary Injunction*

▄▄▄ The preclusion of Calvo's proposed counterclaim and defenses is not completely dispositive of his motion for a preliminary injunction, insofar as that motion seeks to invoke the court's inherent power to regulate the conduct of litigants and counsel appearing before it. *See* Calvo Re-

ply Memorandum at 3, citing *In re Liberatore*, 574 F.2d 78 (2d Cir.1978); *SEC v. Sloan*, 535 F.2d 679, 681 (2d Cir.1976) (motion seeking injunction was in the nature of a request for protective order directed to court's power to control proceedings before it), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). Taken as such, the motion is in the nature of a motion for a protective order addressed to the discretion of the court.

In the exercise of this discretion, the court determines that no injunction is warranted here. Calvo has not met any of the traditional requirements for entitlement to a preliminary injunction. He has not made any showing, for example, that the alleged conduct is likely to continue or that he will suffer irreparable harm to his reputation and business not already caused by the pendency of this action. The inquiry in which the alleged harassment occurred has been closed. *See* Declaration of Stanley Whitten, ¶ 6. Nor does the balance of hardships favor Calvo where an injunction might seriously hamper the SEC's ability to carry on investigations and to encourage witnesses to cooperate. *See, e.g., Yakus v. United States*, 321 U.S. 414, 440–41, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944) (court should consider public interest in determining whether to grant preliminary injunction); *Thomas v. Veterans Admin.*, 467 F.Supp. 458, 464 (D.Conn.1979) (denying injunction where it would intrude upon internal affairs of agency).

The motion for a preliminary injunction is denied.

SO ORDERED.

## RULING ON MOTION TO TRANSFER

Pursuant to 28 U.S.C. § 1404(a),[1] defendant Calvo moves that this action be severed as to him and transferred to the United States District Court for the Southern District of Florida.

*Transfer: The Convenience and Justice Standard*

 Motions to transfer pursuant to § 1404(a) are addressed to the discretion of the court. *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 906 (S.D.N.Y. 1983). In the exercise of discretion to determine whether a transfer is warranted, a court considers such factors as the convenience of the parties and witnesses, including the availability of process to compel the attendance of witnesses; the relative ease of access to sources of proof; the cost of obtaining the attendance of witnesses and other practical problems that make trial of a case more expeditious and inexpensive; and the interests of justice. *See id.* at 906; *Shulof v. Westinghouse Elec. Corp.*, 402 F.Supp. 1262, 1263 (S.D.N.Y.1975).

 However, weight must also be given to the right of the plaintiff to choose its forum. "A plaintiff's choice of forum will not be disturbed unless the movant shows that the balance of convenience and justice weighs heavily in favor of transfer." *Somerville*, 576 F.Supp. at 908. This is particularly true where, as here, the plaintiff's choice of forum was made under a special venue statute. The SEC initiated this action in the District of Connecticut under Section 27(a) of the Securities Exchange Act, 15 U.S.C. § 78aa. The venue provision of the Act represents an affirmative congressional policy choice to allow plaintiffs in securities cases the widest possible choice of forums in which to sue. *S–G Securities, Inc. v. Fuqua Investment Co.*, 466 F.Supp. 1114, 1122 (D.Mass.1978); *Lemberger v. Westinghouse Elec. Corp.*, Fed.Sec.L.Rep. (CCH) ¶ 95,762 at 90,742 (E.D.N.Y.1976) [available on WESTLAW, 1976 WL 834]. Thus, plaintiff's choice of Connecticut is entitled to substantial weight and will not be displaced without a clear-cut showing that factors of convenience and the interests of justice favor trial in the Southern District of Florida. *See First Nat'l City Bank v. Nanz, Inc.*,

---

**1.** Section 1404(a) provides:
 For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The parties do not dispute that venue properly lies in either Connecticut or Florida.

437 F.Supp. 184, 188 (S.D.N.Y.1975); *Richardson Greenshields Securities, Inc. v. Metz,* 566 F.Supp. 131, 134 (S.D.N.Y.1983).

*Convenience of the Parties and Witnesses*

 Calvo argues that the Florida forum is more convenient because he is a resident of Florida and the SEC has a regional office in Miami. In addition, he contends that several witnesses reside in Florida whose testimony he believes to be essential to his defense and who will not voluntarily travel to Connecticut to testify at trial.

The existence of an SEC regional office in Florida is not a compelling factor in Calvo's favor. *SEC v. Savoy,* 587 F.2d 1149, 1155–56 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *SEC v. Golconda Mining Co.,* 246 F.Supp. 54, 59 (S.D.N.Y.1965). From its inception, this case has been investigated and litigated by personnel in the Boston regional office of the Commission; all files and documents are maintained there. The Miami office has not been involved and it is doubtful that the Boston personnel would be reassigned there for the purpose of litigating the case were transfer to be granted. Thus, transfer would necessitate the Commission's attorneys, files, and documents to move between Boston and Florida; travel no less inconvenient than Calvo's journeys from Florida to this court. Moreover, the Commission chose Connecticut over Florida because, in its judgment, litigating in Connecticut would be more convenient.

Calvo's affidavit lists seven witnesses whom he claims will be essential to his defense of the action and will testify to "activities of defendants with regard to allegations of fraudulent closing, misrepresentations concerning the closing, unauthorized disbursement, and failure to disclose Bremer's indictment." Calvo Affidavit, ¶ 3. Each of these witnesses, Calvo states, resides in Florida, is not willing to come to Connecticut voluntarily to testify, and is not subject to compulsory process of this court. Calvo argues that the testimony of these witnesses will be critical and that deposition testimony is not satisfactory because their credibility will be an issue at trial.

Calvo's need for live testimony from these witnesses is entitled to some weight. *See, e.g., Fogel v. Wolfgang,* 48 F.R.D. 286, 291 (S.D.N.Y.1969); *Helfant v. Louisiana & Southern Life Ins. Co.,* 82 F.R.D. 53, 58 (E.D.N.Y.1979). However, Calvo's affidavit does not summarize or in any way particularize the expected testimony of the listed witness to enable the court to assess the strength of his need for their in-person testimony. *See Lemberger,* Fed.Sec.L.Rep. (CCH) ¶ 95,762 at 90,746 (moving party must specify what helpful testimony the witnesses would provide, citing Wright, *Federal Courts* 169 (2d ed. 1970)). Defendant's failure to so specify is no accident. Earlier in this litigation, he noticed the depositions of the Florida witnesses in Florida. Calvo attempted to take these depositions through an attorney who had not filed an appearance for him in this action and in the absence of counsel of record. When SEC counsel attended the first Florida deposition and objected on the record to this procedure, Calvo's attorney adjourned *all* the Florida depositions despite the SEC's willingness to go forward or to seek an immediate ruling from the local District Court. Shortly afterward, Calvo filed his motion to transfer. Subsequently, the court extended discovery for several months for the purpose of permitting the Florida witnesses to be deposed. Calvo could have deposed the witnesses and perhaps even used videotape to preserve demeanor evidence, *see Somerville,* 576 F.Supp. at 907, but has not done so.

In addition, the SEC has identified two key witnesses of its own, Edward Bremer and Gary Granai. Both are defendants in this action who have settled with the Commission, reside in Connecticut, and would be called by the Commission as witnesses at trial. Bremer, as President of Warehouse, and Granai, as its attorney, were intimately involved in the stock offering and thus their testimony is clearly material to this action. The convenience of these witnesses thus weighs on the side of plaintiff's choice of forum.

*Cost of Access to Witnesses*

Calvo argues that, even if the Florida witnesses would agree to come to Connecticut, the cost would be prohibitive. However, transportation to Florida of the several witnesses who reside in Connecticut and New York would also be costly. Nor has Calvo demonstrated that the cost of transporting necessary documents and records from Florida would be unduly burdensome. *See Somerville,* 576 F.Supp. at 908; *S–G Securities,* 466 F.Supp. at 1123. Warehouse's corporate records are presumably maintained in either Connecticut, where the corporation was based and the temporary receiver was appointed, or in Washington, where filed with the Commission. *See Helfant,* 82 F.R.D. at 59 (access to documentary proof easier in state where corporation headquartered).

*Interests of Justice*

The interests of justice reflect such considerations as the avoidance of delay and inefficiency and the maintenance of fairness as between the parties. The Commission contends that, because the heavy criminal caseload which existed as of 1985 in the Southern District of Florida, the trial of this case would be unnecessarily delayed by transfer to that forum. Plaintiff has not presented any showing of when a transferred civil case would be likely to come to trial in Florida and thus the statistics with respect to criminal caseload cannot be given as much weight as, for example, a direct inquiry to the clerk of that court. *Cf. Savoy,* 587 F.2d at 1156 n. 15 (no error where court made own inquiry). Nevertheless, the court does consider that, upon the release of this ruling and of the court's ruling on the Commission's motion for summary judgment, this case will be ready for trial on any remaining issues within a relatively brief period.

The interests of judicial efficiency would be served by retaining the case in this district. Over time, the court has gained a familiarity with the parties and the issues which would be lost by transfer. *See id.* at 1156. In an ancillary proceeding, the court appointed a Temporary Receiver for Warehouse and has overseen both the receivership and the Receiver's related lawsuit for damages against the same defendants as are named in the SEC's complaint.

Finally, Calvo filed his first motion to transfer in November 1986, almost a year after the Commission filed this action and after he had refused to proceed with the depositions of the Florida witnesses. In view of his forebearance, the motion appears less a matter of defendant's necessity and more one of tactics, which is not an appropriate reason for transfer. *Id.* at 1157–58 (defendant made motion in week before trial and made no attempt to obtain evidence through depositions or otherwise).

*Conclusion*

At best, Calvo has shown only that he will be inconvenienced should trial proceed in this district. The SEC would clearly be inconvenienced by trial in Florida, as would at least some key witnesses. Nor would transfer serve any interest of justice. Defendant has not met his burden of showing that the weight of the factors of convenience, access to proof, and justice lies firmly upon the side of transfer so as to overcome the deference accorded to plaintiff's choice of forum. Accordingly, the motion for transfer of the action is denied.

SO ORDERED.