SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

Larry D. BLAVIN, d/b/a Providence
Investment Advisory,
Defendant-Appellant.

Nos. 83–1292, 83–1399, 84–1150
and 84–1151.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 11, 1985.

Decided April 30, 1985.

Geoffrey A.D. Smereck (argued), Detroit, Mich., for defendant-appellant.

Mark A. Loush, S.E.C., Detroit, Mich., Rosalind C. Cohen (argued), S.E.C., Jacob H. Stillman and Allyn Shepard, Washington, D.C., for plaintiff-appellee.

Before MARTIN and JONES, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

## PER CURIAM.

In these consolidated appeals, defendant-appellant Larry D. Blavin, individually, and doing business as Providence Investment Advisory, first appeals from the district court's grant of summary judgment against him. The district court found that Blavin repeatedly violated the anti-fraud provisions of the Securities Exchange Act of 1934 and the Investment Advisers Act of 1940. The district court also found that Blavin had sold investment advice to the public without registering as an investment adviser, as required by the latter Act. Blavin maintains that his own affidavits raised material issues of fact that rendered inappropriate a grant of summary judgment. Blavin also appeals from the disgorgement orders and procedure by which the district court ordered that he relinquish wrongful profits. Upon consideration of Blavin's contentions, we affirm the district court.

## I.

At the time of the events at issue, Blavin was a pharmacist doing business in Farmington Hills, Michigan. Since at least April 1981, he owned Providence Investment Advisory, an unincorporated investment advisory service. From April through November 1981, Blavin authored and published six issues of a newsletter under Providence's name, each discussing a different company and recommending the purchase of its stock. Without registering with the Commission as an investment adviser, Blavin distributed these newsletters to at least 2,080 subscribers who resided in 40 states and Canada, charging them a $30 annual fee. Blavin also mailed copies of his newsletters to other persons in order to solicit additional subscriptions.

In May 1981, Blavin distributed his newsletter to approximately 5,500 subscribers and prospective subscribers. The newsletter recommended the purchase of the securities of Alanda Energy Corporation, a small Canadian company engaged in oil and gas exploration and production. The newsletter contained numerous material misstatements of fact concerning Alanda's present and projected cash flow, its current assets, projected earnings, actual drilling activities, and the anticipated production from Alanda's projected drilling projects. These factual representations were not based upon information Blavin gathered from Lawrence Brophy, an Alanda representative. They also do not appear in other published reports to which Blavin refers in his affidavits.

Blavin's May newsletter also represented Providence as a "chartered and registered service," at a time when it was not registered as an investment advisor with the Commission or any state. The May newsletter contained a disclaimer that "Providence Investment Advisory may trade for its own account." That disclaimer also in-

cluded the statement that "[t]he security portfolio of our employees, officers or affiliated companies may, in some instances, include securities mentioned in this issue." The disclaimer did not reveal that Blavin was the sole owner and alter-ego of Providence. The newsletter did not reveal that during April and May 1981, Blavin had purchased over 10% of the shares available for public trading. During June and July, 1981 Blavin sold his entire Alanda holdings for a profit of at least $76,127.

The Commission's staff learned of the May newsletter and contacted Blavin in June, 1981. Blavin admitted that, despite the representation in his newsletter, he was not registered as an investment adviser under the Investment Advisors Act. Ten days later, Blavin filed an application to register with the Commission. While his application was pending, Blavin published another issue of the Providence newsletter in July. At the Commission's request, on August 3, Blavin consented to delay the effective date of his registration. Nevertheless, Blavin authored and distributed issues of the Providence newsletter in August, October, and November 1981.

The October newsletter recommended purchase of the stock of Velvet Exploration, Ltd., a Canadian company engaged in mineral and gas production. From June through September 1981, Blavin had purchased approximately 25% of the publicly available shares of Velvet stock. The October newsletter also failed to disclose that Blavin had recently purchased a large block of the stock he was recommending. The October newsletter portrayed Velvet's Mexican mining operation, in partnership with the Mexican government, as covering 200 acres of land. In fact, the company's partner was a Mexican national, as required by Mexican law, and the mine covered twenty-two acres. Blavin admitted including non-oil income when he computed the $384,000 figure which the October newsletter represented as the company's annual income from its oil operations.

Blavin asserted in his affidavit that he had received a package of seventy-five doc-

uments, including press releases and financial statements from Velvet's president. According to Blavin, he used those materials in preparing the October newsletter about Velvet, because he found them "especially trustworthy." The materials did not, however, contain any of the misrepresentations that appeared in the Providence newsletter. Blavin testified by deposition, for example, that Velvet's president told him the company's current liabilities were "nil." Blavin testified that he selected an "arbitrary" figure of $15,000 to report, because "it seemed to me there had to be some liability." A March 31, 1981 Auditor's Report, which was released three months before the October newsletter, revealed current liabilities of $145,322. During October and November 1981, Blavin sold Velvet shares for a net profit of $268,-542.

On or about November 6, 1981, Blavin distributed a Providence newsletter that recommended purchase of I.R.E. Financial Corporation securities. From June to November, 1981, Blavin had purchased approximately 10% of the publicly traded shares of I.R.E. His November newsletter did not disclose this ownership of the recommended stock. Blavin's affidavit contends that he prepared the November newsletter primarily from research reports, newspaper articles, and annual reports of the company. The misrepresentations that appear in the Providence newsletter do not appear in these primary materials. Blavin's newsletter overstated both I.R.E.'s projected earnings per share and its cash on hand. The newsletter attributed to I.R.E. the ownership of franchise properties which the company did not own. The newsletter stated that a 168-unit condominium project, which I.R.E. did own, was "sold out" at a net profit of "over $12,000 per unit." In fact, the project was not sold out and the $12,000 figure was overstated.

The Commission filed its complaint in this action on November 17, 1981. On November 18, 1981, the district court entered an order restraining and enjoining Blavin from trading any security that had previ-

ously been mentioned in "any analysis report or newsletter issued or distributed by him." Yet, the district court found, Blavin sold approximately 115,740 shares of I.R.E. between November 18, 1981 and January 29, 1982. On the latter date, the district court entered a preliminary injunction that ordered Blavin to disgorge $179,000 and his remaining shares of I.R.E. stock. On September 20, 1982, the district court found Blavin guilty of criminal contempt for violating both the November 18, 1981 order and the January 29, 1982 order. On appeal, this Court affirmed that judgment.

The district court granted summary judgment to the Commission on its claims against Blavin under the antifraud provisions of the Securities Exchange Act and the Investment Advisers Act. The district court also found that Blavin was operating as an investment adviser without having registered as required by the Investment Advisors Act, that failure to register is a strict liability violation, and that his affidavits raised only an estoppel defense that was legally inapplicable because estoppel does not apply against the Commission in enforcement actions. Finally, the district court entered a permanent injunction enjoining Blavin from future violations of the Acts, and ordered disgorgement of Blavin's profits gained through securities law violations.

On October 27, 1983, the district court appointed a retired state judge as escrow and distribution agent to implement and administer a disgorgement plan. The district court held a hearing on January 25, 1984, to consider the plan proposed by the agent and to hear argument regarding the amount of disgorgement. On February 1, 1984, the court entered an order establishing the amount of disgorgement and an order approving the escrow agent's plan.

The first order directs Blavin to disgorge all profits from trading in Alanda, Velvet and I.R.E. stock, and fees paid by subscribers to the Providence Investment Advisory newsletter. The final figure includes profits from Blavin's own I.R.E. sales and I.R.E. sales by the court-appointed trustee.

In calculating subscription fees, the court found that Blavin had 2,080 subscribers and charged a $30 annual subscription fee. Recognizing, however, that there may have been some rate of non-payment, the court reduced Blavin's liability for fees by 10%.

The court approved disgorgement plan requires the agent to mail notices to all known Providence subscribers, inviting them to submit claims for subscription fees and for trading losses in Alanda, Velvet or I.R.E. Under the plan, persons claiming trading losses must substantiate their claims by submitting records reflecting their purchase and sale of recommended securities. Thereafter, the agent is required to submit a report to the court, listing the claims and recommending which ones should be paid. The Commission may make additional or contrary recommendations. If the total amount of claims to be paid exceeds the amount of the disgorgement fund, claims will be paid on a pro rata basis; if the disgorgement fund exceeds the amount of claims to be paid, any remaining funds will revert to the United States Treasury. By the district court's order, no payments may be made until the present appeals have been determined.

## II.

This Court may only sustain a grant of summary judgment if the materials before the district court " 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363 (8th Cir.1983) (quoting *Scherr Construction Co. v. Greater Huron Development Corp.*, 700 F.2d 463, 465 (8th Cir. 1983)). All evidence must be viewed in the light most favorable to the non-moving party. *Id.* at 1364. Blavin alleges that his two affidavits created numerous issues of material fact that require a trial on the merits. When we view the affidavits as true, however, not a single genuine issue of material fact existed that the district court improperly determined on summary judgment.

With regard to his antifraud violations, Blavin maintains that issues remain concerning the materiality of factual errors contained in the Providence newletters, concerning investors' reliance upon any false and misleading statements, and concerning whether he acted with scienter.

■ First, Blavin does not deny that his newsletters contained false and misleading statements. He denies that any inaccuracies are material, but does not provide analysis or evidence which would create a genuine issue that a reasonable investor would consider the misstatements or omissions important in making an investment decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *SEC v. Washington County Utility District*, 676 F.2d 218, 225 (6th Cir.1982). Unrefuted evidence revealed that Blavin misstated the financial condition, solvency, and profitability of the companies his newsletter recommended. The materiality of such information "is not subject to serious challenge." *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir.1980) (citations omitted).

■ Blavin also emphasizes that his newsletters included a disclaimer that informed his readers that he could be trading in the stock about which he wrote, and that he did not guarantee the accuracy of his stock investment information. The district court found this disclaimer both "false and misleading," *SEC v. Blavin*, 557 F.Supp. 1304, 1312 (E.D.Mich.1983), because it created the impression that Providence Investment Advisory was an investment company with numerous employees whose investments were not all known to management, when in fact Providence was a sole proprietorship of Blavin, who had invested in 25%, 10% and 10% of the publicly available stock of the companies he recommended. In this factual context, a disclaimer that the investment advisor "may" trade in recommended securities for its own account is itself a material misstatement. The effect of such large holdings on Blavin's objectivity in making investment recommendations would be particularly important to his clients. *See Zweig v. Hearst Corp.*, 594 F.2d 1261, 1266 (9th Cir.1979). No genuine issue of material fact existed concerning the materiality of misstatements and omissions contained in Providence newsletters.

■ Secondly, whether or not investors detrimentally relied upon Blavin's misstatements is not material to the present suit. Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money. *SEC v. Lum's, Inc.*, 365 F.Supp. 1046, 1059 (S.D.N.Y.1973). *Accord SEC v. North American Research & Development Corp.*, 424 F.2d 63, 84 (2d Cir.1970); *Berko v. SEC*, 316 F.2d 137, 143 (2d Cir.1963). Violations of the antifraud provisions of Sections 206 of the Investment Advisers Act also do not depend on actual injury to any client. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963); *SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1105 (9th Cir.1977).

■ Third, even assuming the truth of Blavin's assertions in his affidavits that he relied upon published information or information obtained from and approved by a representative of each company whose securities he recommended, there is no doubt that he acted with scienter. The district court found that Blavin acted recklessly by relying, without thorough investigation, upon the information that corporate representatives provided him. Recklessness is a sufficiently culpable state of mind to support a finding of liability under Section 10(b) and Rule 10b–5. *Davis v. Avco Financial Services, Inc.*, 739 F.2d 1057, 1063 (6th Cir.1984); *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 741 (6th Cir.1980). Recklessness is " 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.' " *Ohio Drill*, 625 F.2d at 741 (quoting *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir.1979)). As a fiduciary, the standard of care to which an investment advisor must adhere imposes "an affirma-

tive duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients." *Capital Gains,* 375 U.S. at 194, 84 S.Ct. at 284 (citations omitted). At a minimum, Blavin recklessly failed to disclose that he was trading in stocks that his newsletter recommended, and recklessly failed to satisfy his professional duty to investigate the information upon which his recommendations were based.

■ Although a finding of recklessness is sufficient to support a finding that the defendant acted with scienter, the district court went further and found that the pattern of behavior evidenced in the Commission's exhibits in support of summary judgment created "an overwhelming presumption that this activity was intentional." *Blavin,* 557 F.Supp. at 1312. We caution the district court that such language does not express the proper analysis in a summary judgment context. Nor was it necessary to reach the question of intent because Blavin's recklessness satisfied the scienter requirement.

Blavin also maintains that his affidavits raised genuine issues concerning estoppel defenses to his alleged violation of the Investment Advisers Act's registration requirements. Section 203 of the Act prohibits any person from selling investment advice to the public without first registering with the Commission. 15 U.S.C. § 80b–3. Filing an application with the Commission does not authorize an applicant to operate as an investment advisor. 15 U.S.C. § 80b–3(c)(2). Blavin's application was never granted, but rather was denied by an administrative law judge on March 21, 1983. That denial has since become final.

First, Blavin's affidavits are irrelevant because he violated the Investment Advisers Act by distributing the May newsletter without even having applied for registration. Blavin does not contend that he undertook this action in reliance on the statements or actions of Commission staff. In fact, in deposition testimony he admitted both that he had read the entire Act before

beginning to publish Providence newsletters, and that he was "aware through there that it talked about registration."

Secondly, Blavin's affidavits, even if taken as true, merely assert estoppel defenses against the Commission. The district court held that estoppel does not apply against the Commission in enforcement actions. *Blavin,* 557 F.Supp. at 1310. The D.C. Circuit, however, recently found that equitable estoppel applies to the Commission in an action to review a Commission order censuring an investment advisory firm and associated individuals. *Investors Research Corp. v. SEC,* 628 F.2d 168, 174 (D.C.Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980). The Commission is charged with "treating those subject to its regulation fairly." *Id.* (footnote omitted). *Contra Capital Funds, Inc. v. SEC,* 348 F.2d 582, 588 (8th Cir.1965). It is established that "the government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Services,* —— U.S. ——, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). The Supreme Court recently left open the question of whether estoppel requires "some minimum standard of decency, honor and reliability" when the government deals with citizens. *Id.*

■ Estoppel may be available against the Commission in the present case. Yet, Blavin must at a minimum establish the traditional elements of estoppel. *Id.* It is undisputed that he knew of his responsibility to register under the Act, and to refrain from publishing until he was registered. Blavin did not reasonably rely upon any oral representations Commission agents may have made to him. *See Portmann v. United States,* 674 F.2d 1155, 1167 (7th Cir.1982). Therefore, although the district court's statement of law is questionable, it properly granted summary judgment on this issue as well.

### III.

■ Blavin challenges the district court's disgorgement order as violating his

due process rights to a hearing at which he could challenge claims to the disgorgement fund. He also maintains that the district court's disgorgement order violates his due process and just compensation rights because it provides that funds that remain after all claims have been satisfied shall revert to the United States Treasury. These allegations are based on the misguided belief that disgorgement is a form of restitution that is based upon proof that investors suffered loss through Blavin's securities law violations.

■■■■ The purpose of disgorgement is to force "a defendant to give up the amount by which he was unjustly enriched" rather than to compensate the victims of fraud. *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978). Once the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by Blavin's fraud. In *SEC v. Washington County Utility District*, 676 F.2d 218, 227 (6th Cir.1982), this Court required that the defendant disgorge a sum of money equal to all the illegal payments he received. The district court's attempt to distribute the disgorged funds to identifiable victims of Blavin's fraud neither affects the district court's authority to confiscate Blavin's wrongful profits, nor provides Blavin with any right to challenge those victims' claims to the disgorgement fund. *See, e.g., SEC v. Lund*, 570 F.Supp. 1397, 1405 (C.D.Cal.1983); *SEC v. Golconda Mining Co.*, 327 F.Supp. 257 (S.D.N.Y. 1971).

■■■■ Blavin challenges inclusion of subscription fees he received in the district court's amount of wrongful profits in this case. Disgorgement orders are not limited to confiscation of trading profits. *See Washington County Utility District*, 676 F.2d at 227; *SEC v. Blatt*, 583 F.2d at 1335. *See also SEC v. Penn Central Co.*, 450 F.Supp. 908, 916–17 (E.D.Pa.1978); *SEC v. Galaxy Foods, Inc.*, 417 F.Supp.

1225, 1250 (E.D.N.Y.1976), *aff'd*, 556 F.2d 559 (2d Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). Because Blavin failed to register with the Commission, he was prohibited from selling investment advice, and was not entitled to keep the fees paid by subscribers to his newsletter. Section 215 of the Investment Advisers Act, 15 U.S.C. § 80b–15, declares that "[e]very contract made in violation of any provision of this subchapter … shall be void." The district court was well within its equitable power "to make violations unprofitable," *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972), when it ordered Blavin to disgorge his subscription fees.

■■■■ Finally, Blavin contends that the disgorgement fund should not include profits from the sale of I.R.E. shares that occurred nearly two years after issuance of the relevant newsletter. The district court found that Blavin purchased the I.R.E. shares in connection with the newsletter which recommended purchase of I.R.E. stock. In January of 1982, the district court took possession of the shares of I.R.E. stock because Blavin was continuing to sell shares of I.R.E. in violation of a court order; the district court later found Blavin guilty of contempt of court, in part because of these continued sales of I.R.E. stock. The district court held the stock until it found that Blavin had violated the securities laws, then sold the stock and included in the disgorgement fund the profits derived from that sale.

Blavin does not contend that he would not be liable for profits from the sale of these shares of I.R.E. stock if he had succeeded in selling them himself. He has no equitable claim to the profits realized through the court's sale of these shares. Distributing the actual profits from the sale to Blavin would have rewarded him with a windfall profit from his violation of the district court's injunction. Including these profits in the disgorgement fund did not amount to imposition of a penalty. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir.1972).

### IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment, its disgorgement order and its disgorgement distribution plan.