85 F.3d 630
 Fed. Sec. L. Rep. P 99,250
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
MIDWEST INVESTMENTS, INC., Robert D. Hodge, Michael J.
Eberle, Thomas J. VanEcho, Thomas L. Costello,
Donald H. Gilliland, and Thomas J.
Williamson, Defendants-Appellants.
 No. 94-3433.
 United States Court of Appeals, Sixth Circuit.
 May 6, 1996.
 
 Before: MILBURN and BOGGS, Circuit Judges; and QUIST, District Judge.*
 MILBURN, Circuit Judge.
 
 
 1
 Defendants Midwest Investments, Inc., Robert D. Hodge, Michael J. Eberle, Thomas J. VanEcho, Thomas L. Costello, Donald H. Gilliland, and Thomas J. Williamson appeal the district court's grant of summary judgment in favor of plaintiff, the Securities and Exchange Commission ("SEC"), which granted a permanent injunction, disgorgement, and civil penalties, resulting from defendants' violations of the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. On appeal, the issues are (1) whether the securities acts were unconstitutionally applied to defendants since their selling of securities was done wholly intrastate, (2) whether the district court erred in granting summary judgment in favor of the SEC because the district court failed to find scienter, (3) whether the district court's finding of scienter is unsupported by the evidence, and (4) whether the district court erred in ordering disgorgement. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 The facts of his case are more fully set forth in the district court's order, particularly the preliminary injunction order dated May 18, 1993. Thus, we have only briefly summarized them here.
 
 
 3
 Defendant Midwest Securities, Inc., ("Midwest") is a broker-dealer, licensed by the State of Ohio to sell securities, with its principal place of business in Columbus, Ohio. Since 1993, Midwest has been owned by Midwest Management Company ("MMC"). Defendant Eberle was the president of Midwest. Defendants Hodge, Costello, Gilliland, VanEcho, and Williamson were employed at Midwest, and they were employed at Dublin Securities ("Dublin") before they were employed at Midwest.
 
 
 4
 Larry Reitz incorporated Reitz Data Communications, Inc., ("Reitz") on October 15, 1984. On or about September 1992, Reitz registered an initial public offering ("IPO") of 500,000 units of Reitz stock. Each unit sold for $1.00, and consisted of one share of Class A common stock and three warrants, each of which permitted the purchase of an additional share of class A common stock at a price of $1.00 per share.
 
 
 5
 Dublin arranged for the sale of the Reitz units. Many of the individuals purchasing the Reitz units were employees of Dublin and/or friends and relatives of Dublin employees. These individuals were called "insiders" by the Dublin employees. Defendants Hodge, Costello, Van Echo, Gilliland, purchased units of the Reitz IPO.
 
 
 6
 Dublin began selling shares of Reitz to the public on October 20, 1992, and received orders from customers for the purchase of approximately 1.8 million shares of Reitz stock at $3.50 per share. However, on or about October 22, 1992, Dublin ceased its sales of Reitz stock when agents of the State of Ohio raided its offices and seized its records.
 
 
 7
 On or about January 1993, Hodge, Costello, Williamson, Gilliland, and VanEcho became associated with MMC and Midwest. Midwest also employed approximately 20 other brokers and began offering to buy shares of common stock from the purchasers of the Reitz IPO.
 
 
 8
 Prior to January 15, 1993, Midwest purchased over 270,000 shares of Reitz stock at $1.00 per share and 160,000 warrants at $.25 per warrant. Midwest paid $1.00 per share for the inventory of Reitz stock which it acquired prior to January 15, 1993, and it eventually paid $1.25 for all of the inventory of Reitz stock which it purchased through the exercise of warrants.
 
 
 9
 Defendants began selling shares of Reitz stock to the public at a price of $3.50 per share. The price at which defendants sold Reitz stock remained steady until on or about February 26, 1993, when the price was raised to $3.75 per share. The price changed because Midwest's costs for Reitz stock had increased because it had sold all of the shares which it purchased for $1.00 and had to exercise warrants to obtain more shares, which cost it $1.25 per share. On or about April 7, 1993, defendants Eberle and Hodge decided to raise the price of Reitz stock to $4.00.
 
 
 10
 Between January 15, 1993, and on or about February 26, 1993, Midwest sold 216,100 shares of Reitz stock in 493 trades at $3.50 per share. Between on or about February 26, 1993 and on or about April 7, 1993, Midwest sold 138,700 shares of Reitz stock in 291 trades at $3.75 per share. Between on or about April 7, 1993 and on or about April 12, 1993, Midwest sold 10,000 shares of Reitz stock in 28 trades at $4.00 per share.
 
 
 11
 After a customer agreed to purchase Reitz stock, Midwest mailed a confirmation to the customer. The district court found that Midwest's confirmation was confusing to its own representatives because, from the face of the confirmation, an investor had no way of knowing whether the markup and commission information stated in the confirmation was for the total transaction or a markup and commission per share. J.A. 515. Also Midwest's brokers did not explain the codes on the confirmation to the customers.
 
 
 12
 With regard to Midwest's sales of Reitz stock to investors, the district court found, among other things: (1) that Midwest's brokers did not tell its customers what Midwest had paid for its inventory of Reitz stock; (2) that Midwest's brokers did not tell its customers that Midwest employees sold their units of Reitz stock and warrants to Midwest at a 75 percent profit; (3) that Midwest's brokers did not tell investors that the price of Reitz stock did not reflect free market supply and demand; (4) that Midwest's brokers did not tell customers that Midwest was the only market maker in Reitz stock; (5) that Midwest's brokers did not tell customers the actual amount of compensation which Midwest received as a result of sales of Reitz stock; (6) that Midwest's brokers did not reveal the amount of the markup on Reitz stock to investors; (7) that Midwest's brokers did not reveal the amount of the commission that they received on sales of Reitz stock; and (8) that Midwest's brokers told customers that Reitz stock was in great demand, would increase dramatically in price within one or two years, and would trade nationally within one or two years. J.A. 517.
 
 
 13
 After getting the necessary information from a customer over the telephone, the brokers at Midwest filled out a suitability form for a customer engaging in a transaction of Reitz stock. However, the brokers did not make the suitability determination; Midwest's compliance officer, Alan Clark, reviewed the suitability form and made the determination. If the compliance officer made a positive suitability determination, he sent the form to Midwest's accounting department, which mailed the form to the customer for a signature, along with a confirmation, which set forth the terms of the transaction. Out of about 800 transactions involving Reitz stock, Midwest questioned only about three to five for suitability.
 
 
 14
 Lastly, Midwest earned approximately $791,625 in gross revenue from the sale of Reitz stock to the public. Appellant's brief at 16. "Midwest's and MMC's cash receipts and disbursement[ ] reports demonstrate that Eberle, Hodge, Costello, Gilliland, VanEcho and Williamson personally received $50,000, $52,600, $20,031, $32,664, $16,233 and $15,849, respectively, in connection with Midwest's sale of Reitz stock." Id.
 
 B.
 
 15
 On April 12, 1993, plaintiff SEC filed an action in the district court seeking a temporary restraining order, a preliminary and permanent injunction, and other equitable relief against defendants, alleging that they had violated the Securities Act of 1933 and the Securities Exchange Act of 1934 ("Acts") through knowing and active participation in the sale of shares of stock at artificially inflated and manipulated prices including undisclosed excessive markups. A temporary restraining order was granted.
 
 
 16
 On May 3 and 4, 1993, the district court conducted hearings on the request for a preliminary injunction. On May 18, 1993, the district court issued an order granting the preliminary injunction, and, in the same order, made extensive findings of fact and conclusions of law in support of the preliminary injunction.
 
 
 17
 Subsequently, defendants sought to appeal the district court's grant of the preliminary injunction, filing a notice of appeal on August 13, 1993. On November 18, 1993, we dismissed the appeal for lack of jurisdiction, finding that it was unripe because no final appealable judgment had been issued by the district court.
 
 
 18
 Meanwhile, plaintiff, the SEC, filed a motion seeking summary judgment on October 13, 1993, to which defendants responded on November 15, 1993. Thereafter, on March 31, 1994, the district court granted summary judgment for the SEC. In its order, the district court made permanent its preliminary injunction; held defendants jointly and severally liable for $791,625, the amount of trading profits on the sales of Reitz stock; ordered defendants Hodge and Eberle to pay civil penalties in the amount of $25,000 each; and ordered the remaining individual defendants, namely, VanEcho, Costello, Gilliland, and Williamson, to pay civil penalties of $10,000 each.
 
 
 19
 On April 14, 1994, defendants filed a timely notice of appeal. However, on that same date, the SEC filed several time-tolling motions under Fed.R.Civ.P. 59(e), including a request for an order freezing the assets of all the individual defendants pending satisfaction of the judgment, a request for the appointment of a receiver for Midwest, a request to reopen the case, and a request to amend the judgment.
 
 
 20
 The SEC withdrew its request for the appointment of a receiver on August 23, 1994, and, subsequently, defendants changed counsel. The matter was then referred to a magistrate judge who, in a report and recommendation issued on February 2, 1995, recommended that the motion to reopen the case and the motion for a freeze order be denied, and that the motion to amend the judgment be held in abeyance pending the submission of a proposed order by the SEC. Thereafter, on February 21, 1995, the parties submitted a stipulated proposed final judgment and order of permanent injunction and other equitable relief. In their stipulation to the proposed final judgment and order of permanent injunction and other equitable relief, the parties stated that they had "prepared and agreed upon the Proposed Final Judgment...which is consistent with this Court's previously issued Order date [sic] March 31, 1994." J.A. 1239. The proposed final judgment and order of permanent injunction and other equitable relief provided, among other things, that defendants were jointly and severally liable for disgorgement of $791,625, and it assessed the same civil penalties against the individual defendants as were assessed in the district court's order of March 31, 1994. On March 16, 1995, the district court adopted the magistrate judge's report and recommendation of February 2, 1995, and signed the parties' stipulated proposed final judgment and order of permanent injunction and other equitable relief.[1]
 
 II.
 A.
 
 21
 In their brief, defendants argue, relying on the decision in United States v. Lopez, 115 S.Ct. 1624 (1995), that the Securities Act of 1933, and the Securities Exchange Act of 1934 were unconstitutionally applied to their offering and selling of securities wholly within the State of Ohio. Specifically, they assert that
 
 
 22
 Congress cannot exercise its power over interstate commerce to protect actual and/or potential securities investors residing in an individual state from alleged intrastate securities fraud as it is not a legitimate end, i.e., it is not within the scope of its constitutional authority.
 
 
 23
 Appellant's brief at 26. Defendants further assert that "to the extent the Securities Act does not exempt securities offered and sold wholly within an individual state from the antifraud provisions of Section 17(a) of the Securities Act [15 USCS § 77q(a) ] it is unconstitutional." Id. at 27. However, at oral argument, defendants' counsel conceded that Lopez had no application to this case whatsoever.
 
 
 24
 Moreover, because defendants made extensive use of the mails to perpetuate their fraud, we conclude that the application of the Acts to defendants was a valid exercise of Congress' power under the Postal Clause, U.S. Const. Art. I, § 8, cl. 7. "The Constitution grants Congress plenary authority over the postal system." United States v. Barry, 888 F.2d 1092, 1094 (6th Cir.1989) (citing U.S. Const. Art. I, § 8)). Furthermore, where a statute is enacted based upon Congress' postal power, the fact that the mailings involved are wholly intrastate is immaterial because "the Postal Power Clause does not distinguish between interstate and intrastate matters." Smith v. United States, 431 U.S. 291, 305 (1977).
 
 
 25
 The courts have long expressly held that the antifraud provisions of the securities laws apply when the mails are used, even when the mailings are entirely intrastate. See Bogy v. United States, 96 F.2d 734, 737 (6th Cir.) ("Congress, under its power to establish post offices and post roads, Article I, Sec. 8, United States Constitution, has full control of the mails and may forbid their use in the execution of schemes to defraud."), cert. denied, 305 U.S. 608 (1938)). Further, in Northern Trust v. Essaness Theatres Corp., 103 F.Supp. 954 (N.D.Ill.1954), the defendant challenged the application of Section 10(b) of the Exchange Act because his business was wholly intrastate, being confined to the State of Nebraska. Id. at 962. The district court rejected defendants' argument holding that under the Postal Clause "no limitation to interstate business is...applicable." Id. Thus, we conclude that the Acts were constitutionally applied to defendants in this case.
 
 B.
 
 26
 Defendants argue that the district court erred in granting summary judgment in favor of the SEC under Section 10(b) and Rule 10b-5, Section 17(a)(1) and Section 15(c) of the Exchange Act because: (1) the district court failed to find that defendants acted with scienter as required by those provisions, and (2) the record shows that they did not act with the level of scienter required by the Acts. Defendants assert that the district court ruled without making an express finding of scienter in this case. Appellant's brief at 35. Specifically, they state:
 
 
 27
 The only possible reference to scienter is [the district court's statement] that "[i]f defendants were unaware of the wrongfulness of their conduct, the Court can only conclude that they were blinded by their greed and desire for quick and disproportionate profits."
 
 
 28
 Id. (quoting J.A. 530).
 
 
 29
 Defendants' argument that the district court failed to make a finding of scienter as required under section 17(a)(1) of the Securities Act and Sections 10(b) and 15(c)(1) of the Exchange Act is meritless. In its March 1995 judgment, the district court specifically noted that defendants had "engaged in violations of the federal securities laws involving fraud and manipulation," J.A. 1243, and the judgment explicitly incorporated by reference "the reasons set forth in the Court's Findings of Fact, Conclusions of Law and Preliminary Injunction Order dated May 18, 1993, and the Court's Order dated March 31, 1994." J.A. 1241. Likewise, in its order of March 31, 1994, the district court stated that it would
 
 
 30
 make the preliminary injunction permanent. In doing so, the Court incorporates the findings and conclusions set forth in its May 18, 1993 decision granting the preliminary injunction.
 
 
 31
 J.A. 529. In this order, the district court also made additional findings as to the nature of defendants' fraud, including that "defendants perpetrated a grave fraud on the investing public," that their "conduct was egregious and that both disgorgement and civil penalties are necessary to achieve justice," and that the "nature of [defendants'] fraud was apparent." J.A. 530. The court further stated that "[i]f the defendants were unaware of the wrongfulness of their conduct, the Court can only conclude that they were blinded by their greed and desire for quick and disproportionate profits." Id.
 
 
 32
 Furthermore, in its May 18, 1993 order granting a preliminary injunction, the district court made the following findings:
 
 
 33
 7. The Defendants have made misstatements and omitted to state material facts to investors about the offer and sale of Reitz securities. These include the following: that Midwest did not base the price it charged for Reitz stock on a free, open, and competitive market and that Midwest dominated and controlled the market in Reitz stock. These misstatements and omissions operated as a fraud and deceit about the nature of the market.
 
 
 34
 8. The Defendants knew or, at a minimum, were reckless in not knowing that the markups Midwest charged in the sales of Reitz stock were excessive. They also knew that they had not based the price Midwest charged on a free, open, and competitive market. They knew that the price was not reasonably related to the prevailing market price. Thus, they acted with scienter.
 
 
 35
 J.A. 519 (Emphasis added). Thus, contrary to defendants' assertions, we conclude that the district court made findings of scienter of a sufficient nature to satisfy the statutes.
 
 
 36
 "[S]cienter is a necessary element of a violation of § 10(b) and Rule 10b-5." Aaron v. SEC, 446 U.S. 680, 695 (1980). "The language of § 17(a) strongly suggests that Congress contemplated a scienter requirement under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)." Id. at 695-96. "Recklessness is a sufficiently culpable state of mind for liability under § 10(b) and Rule 10b-5." Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1023 (6th Cir.1979); SEC v. Blavin, 760 F.2d 706, 711 (6th Cir.1985) (per curiam). "Recklessness is " 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.' " Blavin, 760 F.2d at 711 (quoting Ohio Drill & Tool Co. v. Johnson, 625 F.2d 738, 741 (6th Cir.1980)). A reckless omission has also been defined as
 
 
 37
 a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
 
 
 38
 Sunstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 U.S. 875 (1977) (quoting Franke v. Midwestern Okla. Dev. Auth., 428 F.Supp. 719, 725 (W.D.Okl.1976).
 
 
 39
 The SEC asserts that during the proceedings in the district court, defendants abandoned their argument that they lacked a sufficient level of scienter to violate the antifraud statutes, and, therefore, they have waived their right to challenge the district court's finding of scienter in this appeal. We agree. In their response to the SEC's motion for summary judgment, which was filed after the district court issued its preliminary injunction, defendants stated that the parties were in agreement that "judicial ... economy would be promoted by a motion for summary judgment" and that "it is unlikely that such a motion by Defendants would result in reversal of the Preliminary Order...." J.A. 477. The response then stated:
 
 
 40
 In support of its motion, Plaintiff has delivered to Defendants (and has no doubt filed) thousands of pages of deposition copies and other documents. After a great deal of both labor and thought, counsel for Defendants has concluded that any effort to respond to that mass of detail would ... produce little, if any, benefit to anyone.
 
 
 41
 J.A. 477.
 
 
 42
 Further, even were we to address the issue, a review of the record reveals no genuine issue of material fact regarding the issue of scienter. The defendants, all of whom had purchased the IPO of Reitz Data stock knew that Midwest had purchased the stock from them at $1.00 or $1.25 per share, and they knew that Midwest was reselling the stock to the investing public at prices which ranged from $3.50 to $4.00 per share. Defendants also knew that during the relevant period of this case, Midwest was the only firm buying and selling Reitz stock and that the only other firm even quoting a price for the stock was doing so "subject to retail." Further, defendants knew that Midwest set the asking price for Reitz stock based upon the price that Dublin Securities was asking for the stock, as well as its own need to generate income.[2]
 
 C.
 
 43
 Defendants also argue that the district court erred in ordering disgorgement of the profits from their sale of Reitz Data stock.[3] They assert that any violations of sections 17(a)(2) and 17(a)(3) should not require or result in disgorgement because violations of those sections do not require scienter. They further assert that because the record shows that some investors were inclined to purchase Reitz data stock because of their prior contact with Dublin Securities, not all of Midwest's sales of Reitz data stock should be deemed fraudulent.
 
 
 44
 However, although scienter is not required for violations of sections 17(a)(2) and 17(a)(3), the district court did find that defendants acted with scienter. Furthermore, although the record does show that some investors were aware of, and perhaps favorably inclined to, the possibility of purchasing Reitz data stock based upon their earlier contact with Dublin Securities, the record further shows that Midwest nonetheless failed to disclose material information to these investors when it contacted them.
 
 
 45
 "In the exercise of its equity powers, a district court may order the disgorgement of profits acquired through securities fraud." SEC v. Patel, 61 F.3d 137, 139 (2d Cir.1995). "The purpose of disgorgement is to force 'a defendant to give up the amount by which he was unjustly enriched' rather than to compensate the victims of fraud." Blavin, 760 F.2d at 713 (quoting SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir.1978)). See also SEC v. Bilzerian, 29 F.3d 689, 697 (D.C.Cir.1994) ("The primary purpose of disgorgement is not to refund others for losses suffered but rather 'to deprive the wrongdoer of his ill-gotten gain.' ") (quoting SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir.1978)). Moreover, "[o]nce the [SEC] has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by ... fraud." Blavin, 760 F.2d at 713. Thus, we conclude that the district court's order of disgorgement was within its equitable powers and that defendants' challenge to the order of disgorgement is meritless.
 
 III.
 
 46
 For the reasons stated, the district court's judgment is AFFIRMED.
 
 
 
 *
 Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 Defendants did not file a second or amended notice of appeal following the district court's order of March 16, 1995. However, pursuant to Fed.R.App.P. 4(a)(4), their otherwise timely notice of appeal, filed on April 14, 1994, was suspended during the pendency of the Fed.R.Civ.P. 59 time tolling motions, and it became effective when the district court disposed of the time tolling motions in its order of March 16, 1995. See Narcy v. Dean, 32 F.3d 1521, 1523-24 (11th Cir.1994) ("[A]n otherwise timely notice of appeal filed before the disposition of a Rule 59 motion is not voided but instead merely lies dormant while the motion is pending, and the notice of appeal becomes effective as of the date of the order disposing of the Rule 59 motion.")
 However, if a party intends to challenge an alteration or amendment of a judgment, the new version of Rule 4(a)(4) requires the party to file a new or amended notice of appeal to challenge the alteration. See Reeves v. Collins, 27 F.3d 174, 177 (5th Cir.1994) (per curiam). Nevertheless, we note that in this case the parties stipulated final judgment and order of permanent injunction and other equitable relief awards which were virtually identical to the district court's order of March 31, 1994. Thus, we conclude that defendants have not waived any of their arguments by virtue of their failure to file a second or amended notice of appeal.
 
 
 [2]
 Defendants also place great emphasis on a script, J.A. 722, which was allegedly read to customers. Defendants assert that this script disclosed all the relevant information to the customers. However, the evidence suggests that defendants did not begin using this script until sometime late in February or early in March 1993, and at least one of Midwest's brokers testified that he never read the disclosure to any customer before they agreed to buy Reitz data stock. J.A. 1215
 
 
 [3]
 The SEC argues that defendants have waived their challenge to the district court's imposition of disgorgement because they (1) never raised, or (2) abandoned the issue below. We disagree. In their response to the SEC's motion for summary judgment, defendants strenuously argued against the imposition of "disgorgement" and "civil penalties." J.A. 477-80. Thus, we find that defendants' challenge to disgorgement was neither waived nor abandoned