**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**FISCHBACH CORPORATION, Claimant–Appellant,**

**Drexel Burnham Lambert Incorporated, Drexel Burnham Lambert Group Incorporated, Michael R. Milken, Lowell J. Milken, Cary J. Maultasch, Pamela R. Monzert, Victor Posner, Steven N. Posner, and Pennsylvania Engineering Corporation, Defendants.**

**No. 814, Docket 97–6087.**

United States Court of Appeals, Second Circuit.

Argued Oct. 6, 1997.

Decided Dec. 30, 1997.

---

* The Honorable J. Clifford Wallace, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Eric Summergrad, Principal Assistant General Counsel, Washington, DC (Richard H. Walker, General Counsel, Paul Gonson, Solicitor, Hope Hall Augustini, Securities and Exchange Commission, Washington, DC, on the brief), for Plaintiff–Appellee.

Nathan Lewin, Washington, DC (David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, DC, Glen M. Bronstein, New Providence, NJ, on the brief), for Claimant–Appellant.

Before: KEARSE, MINER, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

Claimant Fischbach Corporation ("Fischbach" or "the company") appeals from an order of the United States District Court for the Southern District of New York, Milton Pollack, *Judge*, granting the request of plaintiff Securities and Exchange Commission ("SEC") that funds totaling some $4 million, plus interest, disgorged by defendants Victor Posner ("Posner") and Steven Posner ("Steven") (collectively the "Posners") pursuant to a 1993 judgment against them in this SEC enforcement action for securities fraud ("disgorgement fund"), be paid to the United States Treasury ("Treasury"). Exercising its equitable discretion, the district court ordered payment to the Treasury because it found that no party before the court was entitled to the funds and that the persons who might have equitable claims were too dispersed for feasible identification and payment. On appeal, Fischbach contends that the company was the direct victim of the Posners' fraud and that the company should therefore receive the disgorged funds as res-

titution. For the reasons that follow, we affirm.

## I. BACKGROUND

The background of this litigation is set out in the opinion and supplemental findings of fact of the district court in *SEC v. Drexel Burnham Lambert Inc.*, 837 F.Supp. 587 (S.D.N.Y.1993) (*"Drexel I "*), *aff'd sub nom. SEC v. Posner*, 16 F.3d 520 (2d Cir.1994), *cert. denied*, 513 U.S. 1077, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995), familiarity with which is assumed. We highlight here the facts most pertinent to this appeal concerning the disposition of the funds disgorged following *Drexel I*.

### A. *Posner's Acquisition of Fischbach*

Fischbach is a Delaware corporation whose shares were once traded on the New York Stock Exchange. In early 1980, Posner, through a corporation he controlled, began purchasing large amounts of Fischbach stock. By March 20, according to documents filed with the SEC, he controlled more than 10.5% of Fischbach's outstanding stock. That rapid accumulation of stock prompted Fischbach to negotiate a so-called "Standstill Agreement" with Posner and his son Steven, which restricted the Posners from increasing their interest in Fischbach to more than 24.9%. The agreement provided, however, that that restriction would end if a third party filed "a Schedule 13D under the [Securities] Exchange Act [of 1934, 15 U.S.C. § 78a *et seq.*] relating to the acquisition of more than 10%" of Fischbach's outstanding stock. *Drexel I*, 837 F.Supp. at 597 (internal quotation marks omitted).

Despite that agreement, Posner continued to pursue control of Fischbach, in part by increasing his holdings of Fischbach stock to 24.8%, just short of the cap imposed by the agreement. In addition, assisted by Michael Milken and Ivan Boesky, Posner embarked on a fraudulent "stock-parking" scheme to acquire still more shares and to trigger the Standstill Agreement's termination provision. Milken and Steven Posner recruited Boesky to buy more than 10% of Fischbach's outstanding shares and to file a Schedule 13D reporting Boesky's ownership. In fact, however, Boesky was not to be the real owner in interest of the stock, for when Milken and Steven recruited him, they assured him that he would be "made whole" if the stock price, then above $50 per share, declined. *Drexel I*, 837 F.Supp. at 598 (internal quotation marks omitted).

Boesky agreed to help implement the stock-parking scheme, and in late April 1984 began purchasing Fischbach stock in large quantities. Within a month, he filed a Schedule 13D representing that he owned more than 5% of the company; within three months, he amended his Schedule 13D to reflect that 13.4% of Fischbach's outstanding stock was in his hands. Fischbach concluded from the amended filing that the Standstill Agreement with the Posners was no longer in effect.

With the Standstill Agreement having ended, Posner set about completing his takeover of Fischbach, the market price of whose shares had declined from more than $50 to approximately $35. In February 1985, he purchased Boesky's block of Fischbach stock at an above-market price designed to help offset Boesky's losses. He then acquired a substantial number of Fischbach shares from Milken's firm, Drexel Burnham Lambert Inc. ("Drexel"). By October, Posner possessed a controlling interest in Fischbach.

Posner immediately installed himself as chairman of Fischbach's board and made Steven a director. Over the course of the next several years, both Posners drew millions of dollars from Fischbach, ostensibly as compensation for their services. The Posners' services, however, were of no real value to the company. *See Drexel I*, 837 F.Supp. at 612.

### B. *The SEC's Enforcement Action*

Despite the initial success of the fraudulent scheme to gain control of Fischbach, the details of the stock-parking scheme were soon exposed and its participants were haled into court. Amid much publicity, Boesky, Milken, and Drexel pleaded guilty to criminal charges arising, in part, out of their participation in the scheme.

In 1988, the SEC initiated the present civil action against, *inter alios,* Milken, Drexel, and the Posners, alleging numerous securities laws violations arising from a variety of schemes, including the stock-parking scheme circumventing the Fischbach Standstill Agreement. The SEC's nearly 200–page complaint included allegations of the events set forth above and asserted that the defendants who participated in that scheme had, either directly or as aiders and abetters, violated §§ 10(b) and 13(d) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b), 78m(d), and Rules 10b–5 and 13d–1 thereunder, 17 C.F.R. §§ 240.10b–5, 240.13d–1. The complaint requested, *inter alia,* an order requiring the defendants to account for and disgorge all profits they had gained, as well as moneys equivalent to losses they had avoided, as a result of their illegal conduct.

In 1993, following a four-day bench trial, the district court found that Posner, aided and abetted by Steven, had violated § 13(d) of the 1934 Act "by failing to amend [Posner's] Schedule 13D to disclose [his] beneficial ownership of the Fischbach stock bought by Boesky in mid–1984." *Drexel I,* 837 F.Supp. at 609. The court also found that the Posners had aided and abetted Boesky's § 13(d) violation by "st[anding] ready to compensate him for any losses sustained" on his investment in Fischbach. *Id.* It concluded that the arrangement with Boesky constituted

> a blatant scheme to defraud in violation of section 10(b) [of the 1934 Act] and Rule 10b–5. The very essence of the scheme was to defraud Fischbach by creating the false appearance that the standstill agreement had been voided . . . .

*Drexel I,* 837 F.Supp. at 609.

The district court ruled that the Posners would be required to disgorge the money they had been paid by Fischbach after gaining control of the company, on the ground that

> [h]ad it not been for their fraudulent arrangement with Milken and Boesky, the Posners would not have been able to acquire control of Fischbach and thus would not have been able to place themselves in

high-paid positions at the company. Accordingly they shall be required to disgorge the money paid to them ostensibly as compensation for their services as officers and directors of Fischbach.

*Id.* at 612. The court's Final Judgment as to Defendants Victor Posner and Steven Posner dated December 29, 1993 ("1993 Judgment"), required that the disgorged funds—which, with prejudgment interest, totaled nearly $4 million—be deposited in the Court Registry Investment System, to be "distributed pursuant to a plan of distribution to be prepared by the SEC and approved by the Court." (1993 Judgment at 10.) The 1993 Judgment ordered the SEC to submit the distribution plan "as soon as practicable." (*Id.* at 12.)

This Court affirmed the 1993 Judgment. With respect to the disgorgement order, we noted that "[b]ut for their illegal conduct, the Posners would not have been in a position to plunder Fischbach." *SEC v. Posner,* 16 F.3d at 522. We therefore held that the order was within the district court's "broad discretion to tailor the sanction to the wrongful conduct involved." *Id.*

### C. *Fischbach's Acquisition by AIG*

In the meantime, several years prior to the 1993 Judgment, Fischbach was acquired by one of its creditors, American International Group, Inc., through a subsidiary (collectively "AIG"). By the spring of 1988, AIG had provided Fischbach with surety bonds whose outstanding amount was $500 million and had issued insurance on which Fischbach owed premiums totaling some $23 million. At that time, "Fischbach's financial viability was in jeopardy due to the Posners' abuse of the company and the public disclosure of the harm it had caused." (Fischbach brief on appeal at 8.) Accordingly, AIG began discussing with Posner the possibility of acquiring his stake in the company. Those discussions culminated in an agreement dated November 30, 1989, in which the various corporations through which Posner held his Fischbach stock granted AIG an option to purchase that stock for $12 per share (or book value, if higher), a price term later reduced to $11 per share. On June 8, 1990, AIG exercised its

option and acquired Posner's approximately 53% interest in Fischbach for $11 per share.

Six days later, AIG made a tender offer at $11 per share for all outstanding Fischbach stock. The tender offer documents distributed to Fischbach shareholders stated that AIG viewed Fischbach "as being in financial distress." (AIG Tender Offer dated June 14, 1990 ("AIG Tender Offer"), at 8.) AIG stated that it sought to "exercise control over the day-to-day operations of [Fischbach], and in doing so reduce the potential liability of [AIG]" arising from the outstanding surety bonds on Fischbach projects. (*Id.*) The tender offer resulted in the increase of AIG's ownership of Fischbach to nearly 95%. On August 24, pursuant to Delaware law, AIG effected a "freezeout merger," through which it acquired the remaining shares. Since that time, Fischbach has been a wholly-owned subsidiary of AIG.

### D. *The Distribution of the Disgorged Funds*

In December 1996, some six months after the Posners had finally complied with the disgorgement ordered by the 1993 Judgment, the SEC submitted to the district court its proposed plan for distributing the disgorged funds, requesting that the funds be paid to the Treasury. The SEC noted that Fischbach had urged the agency to propose that the disgorged funds be paid to Fischbach, as restitution of the moneys the company had paid the Posners. In its memorandum to the court in support of its proposal that the funds go instead to the Treasury, the SEC explained that it opposed payment to Fischbach because such a payment would benefit only AIG, "the current owner[ ] of Fischbach," which was not entitled to the disgorgement proceeds because the "battering [Fischbach] had taken was reflected" in the price AIG had paid for the stock. (SEC Memorandum in Support of Motion for Order Directing Payment of Posner Disgorgement to the United States Treasury dated December 20, 1996, at 11.) Noting the sharp decline in the per-share price of Fischbach stock from approximately $35 when the Posners acquired control of the company, to $11 by the time of AIG's acquisition of the company, the SEC argued that the persons actually injured by the Posners' looting were the minority shareholders. (*See id.* at 10–11.) The SEC stated that although its policy "wherever possible [is] to recommend a distribution plan by which a defendant's unlawful gains are paid out to defrauded investors," the circumstances of this case made identification and location of those persons, and quantification of their claims, impracticable. (*Id.* at 2.)

Fischbach submitted papers to the court opposing the SEC's proposal and argued that the company should receive the funds as restitution on the ground that "Fischbach is indisputably the person injured by payment of the excessive compensation that the Posners have now disgorged." (Fischbach Memorandum Supporting Entry of an Order Directing Payment of the Posner Disgorgement Fund to Fischbach dated January 9, 1997, at 2.) Fischbach contended that "[r]eturn of the Posners' compensation to Fischbach" would not be a windfall to AIG, "but simply the return of funds the Posners obtained from Fischbach in violation of federal securities laws." (*Id.* at 11–12.)

In an opinion reported *sub nom. SEC v. Drexel Burnham Lambert, Inc.,* 956 F.Supp. 503 (1997) (*"Drexel II "*), the district court granted the SEC's motion and ordered that the disgorgement fund be paid to the Treasury. The court began by noting that disgorgement and restitution were "distinct" remedies "in that restitution aims to make the damaged persons whole, while disgorgement aims to deprive the wrongdoer of ill-gotten gains." *Drexel II,* 956 F.Supp. at 507. Stating that determining an appropriate distribution of disgorged funds is within the court's "broad equitable power to fashion appropriate remedies," *id.* (internal quotation marks omitted), the court found that Fischbach had

> no equitable claim to the Fund. The damage done to Fischbach by the Posners occurred before AIG acquired Fischbach. Awarding the Fund to Fischbach would thus be a windfall to AIG, and would do nothing to compensate those persons directly damaged by the Posners' looting of Fischbach,

*id.* at 507–08. According to the district court,

> [t]he persons damaged by the Posners' looting of Fischbach were the minority shareholders who held Fischbach stock during the years the Posners controlled the company. It would be difficult and costly to identify and locate these shareholders, and it would be difficult to devise a coherent formula for distributing money among them. It would therefore be impracticable to pay the Fund to the minority shareholders.

*Id.* at 508. The court found Fischbach's equitable position to be "further weakened" by the company's failure to sue Posner directly:

> The fact that the SEC had already brought this action does not excuse Fischbach's failure to act. The SEC does not seek to vindicate discrete private rights, and an SEC action does not preclude private parties from bringing their own actions. Having let the government pay the bill for the lawsuit ... Fischbach is now seeking a windfall.

*Id.* (internal quotation marks omitted).

The court thus ordered that the disgorged funds be paid to the Treasury. This appeal followed.

## II. DISCUSSION

On appeal, Fischbach contends that the district court was required to order payment of the disgorgement fund to Fischbach. It argues principally that it was the victim of the Posners' securities fraud and that, as such, it is entitled to receive the disgorged money as restitution, and it challenges the district court's assessment that its equitable claim to the fund was weakened when the company was taken over by AIG. Finding no basis for reversal, we affirm.

### A. *Disgorgement Principles*

■ The crafting of a remedy for violations of the 1934 Act lies within the district court's broad equitable discretion. *See, e.g., SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1474 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21

(1997); *SEC v. Wang,* 944 F.2d 80, 85 (2d Cir.1991); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1103 (2d Cir.1972). As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits. *See, e.g., SEC v. Patel,* 61 F.3d 137, 139 (2d Cir.1995); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d at 1104. Once the profits have been disgorged, it remains within the court's discretion to determine how and to whom the money will be distributed, and the district court's distribution plan will not be disturbed on appeal unless that discretion has been abused. *See, e.g., SEC v. Wang,* 944 F.2d at 85; *SEC v. Certain Unknown Purchasers of the Common Stock of and Call Options for the Common Stock of Santa Fe International Corp.,* 817 F.2d 1018, 1020 (2d Cir.1987) ("*Santa Fe*"), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988).

■ The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains. *See, e.g., SEC v. First Jersey Securities, Inc.,* 101 F.3d at 1474; *SEC v. Wang,* 944 F.2d at 85; *SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir.1987) ("The paramount purpose of ... ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing."), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." *SEC v. First Jersey Securities, Inc.,* 101 F.3d at 1474 (internal quotation marks omitted); *see SEC v. Manor Nursing Centers, Inc.,* 458 F.2d at 1104; *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.) ("It would severely defeat the purposes of the [1934] Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation."), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971). Although disgorged funds may often go to compensate securities fraud victims for their losses, such compensation is a distinctly secondary goal. *See, e.g., SEC v. Common-*

*wealth Chemical Securities, Inc.,* 574 F.2d 90, 102 (2d Cir.1978). Thus, the measure of disgorgement need not be tied to the losses suffered by defrauded investors, *see, e.g., SEC v. First Jersey Securities, Inc.,* 101 F.3d at 1475; *SEC v. Huffman,* 996 F.2d 800, 802 (5th Cir.1993), and a district court may order disgorgement regardless of whether the disgorged funds will be paid to such investors as restitution, *see, e.g., SEC v. Tome,* 833 F.2d at 1096; *SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985) (per curiam); *see also SEC v. Wang,* 944 F.2d at 88 (affirming distribution plan that engaged in "line-drawing[, ]which inevitably leaves out some potential claimants"); *Santa Fe,* 817 F.2d at 1021 (affirming plan that compensated "only those investors who suffered actual out-of-pocket losses").

Fischbach has not cited, and we have not located, any case in which a district court's exercise of its discretion to refuse to order that a disgorgement fund be paid out as restitution has been overturned. Given the above authorities, we conclude that although it is normally within the district court's discretion to order that disgorged funds be used to compensate securities fraud victims, there is no merit in Fischbach's contention that such an order is required.

### B. *Fischbach's Equitable Claim*

■ Even if victims of securities fraud were normally entitled to be compensated out of disgorged funds, we see no abuse of discretion in the rejection of Fischbach's claim in the present case, in light of the fact and circumstances of the change in Fischbach's ownership.

Although theoretically the looting of a corporation injures the corporation itself, there can be little doubt that the corporation's financial circumstances, to the extent they are known, normally affect the market value of its securities. Here, during the period in which the Posners controlled the company and drew their excessive salaries, the price of a share of Fischbach stock plummeted from approximately $35 to under $11. Thus, as the company itself acknowledges, "[t]he harm inflicted by the Posners on Fischbach" was "reflected in Fischbach's per-share price." (Fischbach brief on appeal at 34.)

Accordingly, as indicated in its tender offer, AIG considered Fischbach to be "in financial distress." (AIG Tender Offer at 8.) And just as AIG bought from the Posners at the "distress" price of $11 per share, the individual shareholders from whom AIG bought at $11 sold at a distress price. The price AIG paid reflected the looted state of the company, and it is thus plain that the loss resulting from the Posners' looting of Fischbach was ultimately borne by the Posners' fellow Fischbach shareholders. Directing payment of the disgorgement fund to Fischbach would not compensate the company's former minority shareholders for their losses. Such a payment would redound solely to the benefit of Fischbach's current owner, AIG.

We conclude that it was well within the discretion of the district court to conclude that AIG, which sought to, and did, buy Fischbach at a "distress" price, would receive a windfall if it were now given the funds whose loss had contributed to Fischbach's distress.

■ We reject Fischbach's contention that payment to it would not result in a windfall for AIG on the theory that, by purchasing Fischbach, AIG acquired the right to benefit from any recovery from the Posners. The premise of that contention is that under the law of Delaware, the state in which both Fischbach and AIG are incorporated, any claim against the Posners for waste of corporate assets belonged not to the minority shareholders but to Fischbach itself. This argument misses the mark, for the company's right to bring its own action against the Posners at law has no bearing on its equitable claim for restitution in a suit brought by the SEC. In determining an equitable distribution of the disgorgement fund, the district court was not restricted by the legal fictions on which Fischbach relies.

### C. *Other Arguments*

■ Fischbach also argues, for the first time on appeal, that granting the disgorged funds to Fischbach would not be a windfall for AIG because the price at which AIG acquired Fischbach reflected the possibility

that Fischbach would be paid the disgorged funds. Were we to reach this argument despite Fischbach's failure to raise it in the district court, we would find it unpersuasive for several reasons, including the following. There is no evidence in the record to support a finding that a possible award to Fischbach was reflected in the market price of Fischbach stock when AIG acquired it, and Fischbach's speculation is not an appropriate basis on which to conclude that the district court abused its discretion. In addition, when AIG acquired Fischbach, the SEC suit was in its early stages, and it would be inappropriate simply to assume that the market price of the shares would have been significantly impacted by the prospect of a judgment that could be (and indeed was) several years away. This is especially so in light of the fact that the SEC's complaint included no request for any monetary award to Fischbach. We see no reason to accept Fischbach's unsubstantiated suggestion that AIG's tender offer price reflected a market expectation that Fischbach would receive an award in the SEC's suit.

Finally, Fischbach takes issue with the district court's statement that its claim was weakened by its failure to sue the Posners independently, and we note that the parties have devoted considerable effort to arguing whether a state-law action brought by Fischbach against the Posners would be equitably barred because its new owner bought the company from the Posners with knowledge of their looting. We need not address these issues. Whether or not a new owner is entitled to bring an action against looters from whom it purchased control, we conclude, for the reasons discussed above, that it is well within the discretion of the district court not to order that disgorged funds be paid to the looted company after it has been wholly acquired by a party that purchased it at an acknowledged distress price.

## CONCLUSION

We have considered all of Fischbach's contentions on this appeal and have found in them no basis for reversal. The order of the district court directing payment of the disgorgement fund to the Treasury is affirmed.